ILLINOIS BELL TELEPHONE CO. v. SLATTERY et al.

No. 6671.

Circuit Court of Appeals, Seventh Circuit.

Feb. 22, 1939.

See, also, 98 F.2d. 930.

Montgomery S. Winning, of Springfield, Ill., Thomas A. Keegan, of Chicago, Ill., and John E. Cassidy, Atty. Gen. of Illinois, for appellants.

William P. Sidley, Kenneth F. Burgess, Leslie N. Jones, W. Clyde Jones, and Barnet Hodes, all of Chicago, Ill., for appellee.

Before MAJOR and TREANOR, Circuit Judges, and WHAM, District Judge.

MAJOR, Circuit Judge.

This is an appeal from a decree of the District Court, specially constituted under Section 266 of the Judicial Code, 28 U.S. C.A. § 380, entered February 5, 1938, denying the claim of the State of Illinois, one of the defendants, to unclaimed refunds in the possession of the plaintiff.

On August 16, 1923, the Illinois Commerce Commission entered an order reducing certain of the plaintiff's rates for telephone coin box service in the City of Chicago. Plaintiff filed its bill of complaint in the Federal District Court on September 20, 1923, praying that an injunction be entered permanently restraining the persons constituting the Illinois Commerce Commission and the Attorney General from enforcing the order. On December 21, 1933, an interlocutory injunction was granted by the Statutory Court which contained the following provision:

"This order shall not take effect until the plaintiff shall enter into its bond or undertaking in the sum of One Million Dollars ($1,000,000), conditioned upon the payment of such costs and damages as may be incurred or suffered by any party who may be found to have been wrongfully enjoined or restrained by a temporary restraining order heretofore, on September 27, 1923, entered in this cause by this court or by this interlocutory injunction, and further conditioned so that in the event that this interlocutory injunction shall be hereafter dissolved, the plaintiff shall refund to its several subscribers, either in cash or by credit upon subsequent bills, any sums paid by them in excess of the sums chargeable to them, pursuant to the provisions of said order of the Illinois Commerce Commission."

On March 1, 1931, an additional bond of $5,000,000 was required conditioned upon the event that if the interlocutory injunction was thereafter dissolved, the plaintiff should: " * * * well and truly repay to each or any of its subscribers, or to the persons entitled thereto, with interest, either in cash or by credit on subsequent bills, and in such way and manner as the said District Court of the United States, for the Northern District of Illinois, may hereafter direct, any sums paid by the said subscribers to the plaintiff for telephone service rendered such subscribers, in excess of the sums chargeable to said subscribers, or any of them, pursuant to the provisions of the said order of the Illinois Commerce Commission, during the period from the date of said temporary restraining order to the date of the final decree that may be hereafter entered, the enforcement of which is enjoined, * * *."

After various proceedings in which the case has on four occasions been in the Supreme Court of the United States (Smith v. Illinois Bell Tel. Co., 269 U.S. 531, 46 S.Ct. 22, 70 L.Ed. 397; Id., 282 U. S. 133, 51 S.Ct. 65, 75 L.Ed. 255; Id., 283 U.S. 808, 51 S.Ct. 646, 75 L.Ed. 1427; Ex parte Smith, 283 U.S. 794, 51 S.Ct. 482, 75 L.Ed. 1419), a decree of permanent injunction was entered on June 28, 1933, which, upon appeal, the Supreme Court in Lindheimer et al. v. Illinois Bell Telephone Company, 292 U.S. 151, 54 S.Ct. 658, 668, 78 L.Ed. 1182, reversed, and remanded the the case with directions "to dissolve the interlocutory injunction, to provide for the refunding, in accordance with the terms of that injunction and of the bonds given pursuant thereto, of the amounts charged by the company in excess of the rates in suit, and to dismiss the bill of complaint." The mandate of the Supreme Court was filed in the District Court on June 1, 1934, and a decree was entered vacating the decree of June 28, 1933, dissolving the interlocutory injunction, directing that the defendants should be paid their taxable costs, appointing counsel to represent subscribers and ordering them to prepare and present within seven days a plan for the refunding of excess charges to the subscribers. This decree provided for the retention of jurisdiction in the following language:

"To the end that refunds shall be made as required by the mandate of the Supreme Court, this Court reserves and retains jurisdiction of this cause, the parties and the subject matter, to the end that such further orders and decrees shall be entered herein as may be appropriate to protect and settle the equities or rights of the parties hereto and of the several subscribers of the plaintiff and of all persons having rights under the bonds given herein or injunction issued, or in the refunds of the amounts charged by the plaintiff in excess of the rates fixed by the said order of the Illinois Commerce Commission of August 16, 1923; and to provide for the refunding and restitution of such amounts and interest thereon to those who may be entitled thereto;"

Thereafter, on June 11, 1934, counsel for the subscribers presented their report in which they suggested a plan for making refunds. Among other things it was suggested that the payments should be made directly by plaintiff rather than requiring the money to be paid into court and distributed by a Special Master, for the reason that plaintiff was agreeable to undertake such work and to assume the expenses thereof, and also for the reason that plaintiff was in the better position to make such refunds than anyone else. It was also suggested that plaintiff be required to make such refunds within a reasonable period. On June 11, 1934, a decree was entered containing elaborate provisions for the making of such refunds, together with 5% interest thereon, in conformity with the suggestions made by counsel for the subscribers. The decree contained provision for the giving of notice by the plaintiff to its subscribers and fixing June 1, 1937, as the expiration of the period during which claims might be filed and provided—

"On and after that date, to-wit: June 1, 1937, plaintiff shall be released as to all refunds which it has not been able to make in compliance herewith except as to those subscribers who during said six months' period (or prior thereto) shall have made claim theretofore to the plaintiff, and except, further, as to those refunds respecting which questions are pending before this Court at that time or where the matter of refund is in dispute between the subscriber and plaintiff."

It was also provided that plaintiff pay to the City of Chicago the sum of $69,-590.70 and to the Attorney General for himself and the Illinois Commerce Commission, the sum of $100, which amounts were determined and fixed as taxable costs such parties were entitled to recover. The last paragraph of such decree is as follows:

"The Court hereby reserves the right to make such other and further orders herein as shall preserve the rights of the subscribers of plaintiff to the refunds herein directed or as shall be necessary to settle questions arising hereunder."

At the time of the entry of this decree, counsel for all interested parties, including the Attorney General as counsel for the Illinois Commerce Commission, as well as the State of Illinois, was present in court and either consented or made no objection to the entry of such decree. On July 23, 1934, a decree was entered which fixed and determined the fees to counsel for subscribers at 7½% of all refunds, whether or not distributed by June 1, 1937. On December 31, 1934, a decree designated as supplemental to that of June 11, 1934, was entered containing additional provisions with reference to the making of refunds by plaintiff, in which decree it was again provided "plaintiff shall be released as to all refunds which it has not been able to make in compliance with this and such former decrees," and concludes "the court hereby reserves the right to make such other and further orders herein as shall preserve the rights of plaintiff and the rights of its subscribers to the refunds directed to be paid by the decrees of this Court, or as shall be necessary or desirable to settle and dispose of questions arising under this and other decrees of this Court."

Plaintiff commenced the work of making refunds immediately following the decree of June 1, 1934, and employed as many as 2000 people at one time for that purpose. The work was performed under the supervision of a representative appointed by the court and during the three years subsequent to June 1, 1934, made to the court numerous reports of its progress and its efforts to locate subscribers who might be entitled to a refund. On June 2, 1937, at the expiration of the three-year period provided for in the decree of June 11, 1934, plaintiff filed its final report which disclosed that the total amount of overcharge, with interest, was $18,798,980.14, of which amount $4,074,254.15 represent-

ed interest, and that there remained unrefunded the sum of $1,688,295.68.

On June 3, 1937, the plaintiff filed a petition reciting that the period for making refunds had expired, that it had complied with all former decrees, and that it had incurred expenses to the extent of $2,700,000 in making the refunds. The petition prayed, among other things, that an order be entered permitting the plaintiff to destroy the records relating to the refunds, discharge it from any further liability for refunds, and—

"* * * further finding and adjudging that any sums unrefunded after payment of all proper claims filed on or before June 1, 1937, are and shall remain the property of the plaintiff, Illinois Bell Telephone Company."

On June 14, 1937, the State of Illinois presented a petition in the name of the Attorney General asking that the Illinois Commerce Commission be reimbursed for expenses it had incurred during the prior litigation and that the balance of the unrefunded moneys be turned over to the Treasurer of the State of Illinois as a trustee for such subscribers as had not made application for refunds prior to June 1, 1937. December 23, 1937, the District Court rendered an opinion in which it held that the State was not entitled to the unrefunded balance because no statute existed authorizing such allowance, because the Illinois Commerce Commission had not acted as the agent of the subscribers and for the further reason that such relief was not in harmony with the mandate of the United States Supreme Court, and therefore, the court was without jurisdiction. Thereafter, on January 21, 1938, the Attorney General filed a supplemental petition in which it was recited, among other things, "that though every reasonable effort has been made to locate and repay to subscribers the money due them, as directed by the mandate of the Supreme Court of the United States dated May 31, 1934, the sum of approximately $1,600,000 remains unclaimed in the custody and possession of the plaintiff as of June 1, 1937" and in which petition it was represented that such unclaimed refunds were ownerless and therefore the property of the State of Illinois in its sovereign right as the owner of all property having no other owner. The petition contained a prayer to the effect that an order be entered directing the plaintiff to pay over to the Treasurer of the State of Illinois, money in its possession as of June 1, 1937, representing sums collected from October 16, 1923, to June 1, 1934, in excess of the rates fixed by the order of the Illinois Commerce Commission dated August 16, 1923, as the absolute property of the State of Illinois. On January 24, 1938, the supplemental petition was denied.

February 5, 1938, the court entered a decree finding, among other things, "that the decree previously entered by this court on June 11, 1934, was a final decree and finally disposed of all the questions then and now before the court; that all of the parties consented to the entry of the decree and that the parties objecting at this time were before this court when said decree was entered and consented thereto, and that the claims of the customers who have not made application for refunds are now barred by the decree of this court." In the same decree the sum of $60,000 was awarded to the State of Illinois to reimburse it for expenses incurred by the Illinois Commerce Commission and $37,000 to the City of Chicago for additional expenses which it had incurred, and for which it had not been reimbursed, and decreeing, upon making such payments, the plaintiff "is discharged in full from all liability under the previous final decree of this court and the jurisdiction of this court over said proceedings and over said accounting ceases." From this decree the State appealed to this court. The plaintiff filed a motion to dismiss, attacking our jurisdiction, which motion was overruled August 9, 1938. Illinois Bell Telephone Company v. James J. Slattery et al., 7 Cir., 98 F.2d 930.

The essential questions to be determined upon this appeal are, (1) Has this court jurisdiction to entertain the appeal? (2) If so, was the decree of the Statutory Court, entered February 5, 1938, denying the relief prayed for in the petitions of the Attorney General, erroneous? This involves the jurisdiction of the court to entertain such petitions and also the question as to whether its former decree of June 11, 1934, was final, thereby precluding an allowance of the relief sought. If jurisdiction exists and its former decree be held not determinative of the issue presented, was the State of Illinois entitled to the unpaid refunds under a common law principle known as Bona Vacantia?

■ As to the question of our jurisdiction, it is urged that an appeal from a three-judge statutory court lies only to the Supreme Court of the United States; that the question presented by the appeal involves a construction of the mandate of the Supreme Court, and, therefore, that court and no other has jurisdiction. Notwithstanding the fact that this jurisdictional question has heretofore had our careful consideration, we have, on account of the importance of the matter, again made a study of the situation presented in this respect and find no reason to change the conclusion heretofore reached. Inasmuch as our reasoning and conclusion is found in Illinois Bell Telephone Company v. Slattery, supra, no useful purpose would be served in a further discussion of the question.

Of importance in determining the validity of the decree here assailed is the construction and effect to be given to the decree of June 11, 1934. Plaintiff argues that that decree was final, and that by its express terms, plaintiff was released from all liability after June 1, 1937, and that the Attorney General, as the representative of the State of Illinois, being present at the time of its entry and not appealing therefrom, is bound, and thereby precluded from asserting its claim now in controversy. It is also argued that the court had no jurisdiction in the matter except to perform those acts necessary in the execution of the mandate of the Supreme Court and that, inasmuch as such mandate makes no provision for the disposition of unclaimed refunds by subscribers, that the court below was without jurisdiction. On the other hand, it is contended by the defendant, that notwithstanding that it was in court by its Attorney General at the time of the entry of the decree, and consented thereto, it is not a final decree in that it makes no provision for the disposition of unclaimed refunds; that such matter was not considered by the court or any of the parties at the time of the entry of the decree and that as a matter of fact, the state, at that time, could have urged no claim and was not in a position to do so until after June 1, 1937, as it was not before that date that it was possible to determine that any unclaimed refund would remain in the custody and possession of the plaintiff. It is also urged by the defendant, not only that the court expressly retained jurisdiction, but that irrespective of such retention, it had juris-

diction of the parties and the subject matter and that, under its general equity powers, had jurisdiction to entertain the claim which the state presented subsequent to the time when it was determined that such fund remained in the possession of the plaintiff.

To our minds the court's conclusion that it was without jurisdiction to entertain the claim of the State of Illinois and its construction of its decree of June 11, 1934, are so interwoven that they may be properly considered together. With reference to its jurisdiction, the court said:

"We are limited in our jurisdiction to granting only such relief as is in harmony with the mandate of the United States Supreme Court. The decree which we were authorized to enter was determined by the opinion and mandate of the United States Supreme Court. As we read that decision and as we now read it, we were only authorized to make refunds in accordance with the terms of the injunction and of the bond given pursuant thereto. This being so, and as we again read the injunction and the bond and construe the word 'refund,' we find ourselves limited to directing the Telephone Company to pay excess charges to its customers."

■ The mandate of the Supreme Court, issued May 31, 1934, contained the following directions:

"The decree of the said District Court, in this cause be, and the same is hereby reversed with costs * * * and the same is hereby, remanded to the said District Court with directions to dissolve the interlocutory injunction, to provide for the refunding, in accordance with the terms of that injunction and of the bonds given pursuant thereto, of the amounts charged by the Company in excess of the rates in suit, and to dismiss the bill of complaint.".

With the conclusion of the lower court that its jurisdiction was limited in granting only such relief as was directed by this mandate, we do not agree. Admittedly, it is the duty of an inferior court to carry into execution the terms of a Supreme Court mandate, but it does not follow from this that the court is without jurisdiction to give consideration to any question left open by the mandate and opinion of such court. Here, no question was before the Supreme Court as to the right of the State of Illinois in unclaimed refunds or of the right of any other

agency or person to such refunds. The effect given to the mandate was considered by us on the question of our jurisdiction in Illinois Bell Telephone Company v. Slattery, supra. We repeat what we there said:

"It would seem that the construing of a mandate presupposes that a problem has been presented to an Appellate Court and that the Court has passed upon the problem and returned it to the lower Court with its command. On the original appeal to the Supreme Court, the sole problem was the validity of an order of the Illinois Commerce Commission directing the reduction of certain telephone rates. Defendants in the instant matter contended before the Court below that they, and they alone, were entitled, by reason of their status as a sovereign, to all unclaimed ownerless personal property. That question was not an issue between the parties to the original suit and was not involved in the original appeal to the Supreme Court. The question did not arise until June 1, 1937, when some $1,-600,000 was found to remain unclaimed. Under such circumstances, the Supreme Court, in its opinion, did not touch upon the question and neither did its mandate, either expressly or impliedly. The only provision in the mandate here material was that for the refunding, in accordance with the terms of the injunction and the bond given pursuant thereto of the amounts charged by plaintiff in excess of the rates as fixed by the Commission. By the express language of each, as heretofore related, such refund was for the benefit of plaintiff's subscribers. It is apparent that the Court below neither failed nor refused to carry out the mandate of the Supreme Court, nor has it misconstrued it. On the other hand, the mandate has been fully and completely executed. To hold otherwise is to read into the mandate something which is not there and which, from the nature of the situation, could not properly be there." [98 F.2d 932.]

Undoubtedly, the court at all times had jurisdiction of the parties and of the subject matter, and when a new and different question arose, such as that here presented, one not considered by the Supreme Court in its opinion, or directions given with reference thereto in its mandate, the court was not foreclosed by lack of jurisdiction to give consideration thereto.

In Ex parte Union Steamboat Company, 178 U.S. 317, 20 S.Ct. 904, 44 L.Ed. 1084, the court on page 319, 20 S.Ct. on page 905, said:

"The inferior court is justified in considering and deciding any question left open by the mandate and opinion of this court, and its decision upon such matter can only be reviewed upon a new appeal to the proper court (Re Sanford Fork & Tool Company, 160 U.S. 247, 256, 16 S.Ct. 291, 40 L.Ed. 414, 416); and the opinion of this court may be consulted to ascertain exactly what was decided and settled."

In Re Sanford Fork & Tool Company, 160 U.S. 247, 16 S.Ct. 291, 40 L.Ed. 414, the Court on page 256, 16 S.Ct. on page 293, said:

"But the circuit court may consider and decide any matters left open by the mandate of this court; and its decision of such matters can be reviewed by a new appeal only. [Citing cases.]"

To the same effect is Mason v. Pewabic Mining Company, 153 U.S. 361, 14 S. Ct. 847, 38 L.Ed. 745.

Admittedly, as the court below stated, it was only authorized to make refunds in accordance with the Supreme Court mandate. The word "refund" as defined by Bouv.Law Dict. Vol. 3, Rawles Third Revision, page 2856 is: "To pay back by the party who has received it, to the party who has paid it, money which ought not to have been paid." Here, the State of Illinois is asserting a claim wholly unrelated to a question of refunds. It is based upon a premise foreign thereto. We do not think it can be precluded on jurisdictional grounds from asserting such claim.

This brings us to the question as to whether the decree of June 11, 1934, was a final adjudication of plaintiff's liability as to the funds which it had in its possession by reason of the collection of rates greater than those prescribed. That it was final insofar as it pertained to the execution of the mandate of the Supreme Court, we think is apparent, but in our judgment, it does not necessarily follow that it was final as to the claim which was subsequently presented by the state and which we are now considering. It recited "on and after that date, to-wit: June 1, 1937, plaintiff shall be released as to all refunds which it has not been able to make in compliance herewith * * *." The reasonable interpretation of that language

is that the plaintiff was released from any claims which might be presented by the subscribers after the expiration of the limitation fixed, but it does not follow that by such provision it was released so far as the state was concerned. As heretofore stated, the claim of the state is predicated upon a theory other and different from those who are entitled to refunds. A reading of this decree, as well as what transpired in the court at the time of its entry, and subsequently, convinces us that neither the court nor any of the parties at that time had in mind, intended to or made provision for the disposition of funds which might remain in the possession of the plaintiff, unclaimed by subscribers, after June 1, 1937, nor that there was any intention to' release plaintiff of any liability for such unclaimed funds.

■ At the time of the entry of the decree of June 11, 1934, the court, as well as the parties, without doubt, was vitally interested in adopting a plan which would permit the refunding by the plaintiff to its subscribers of the money in its possession as expeditiously as possible. Not only was such a course consistent with the mandate of the Supreme Court, but also was consistent with the public importance of the matter involved. A careful and methodical plan was adopted. It is now argued that the present position of the Attorney General is inconsistent with the approval which he accorded the decree at that time. We do not think so. ' No doubt that official of the state was as greatly interested in having an expeditious distribution of the funds as anyone else, and we see no occasion why he should, at that time, object to the decree because no provision was made for any rights which the state might claim in that portion of the funds not distributed according to the decree. In fact, it could not be determined until June 1, 1937, that any of such funds would remain in the possession of the plaintiff. For the Attorney General to have raised the question at the time of the entry of the decree would, perhaps, have resulted in nothing more than delay and confusion in the adoption of the plan proposed. What reason would have moved a court at that time to consider a question, the relevancy of which could not be ascertained until three years later? We apprehend that an appeal from that decree, raising the question as to the rights which the state might have after the ex-

piration of the three year period, would have received scant consideration in an appellate tribunal. Plaintiff premises a rather critical argument on the fact that the Attorney General first made claim to the unrefunded balance after June 1, 1937, and yet, so far as we are able to discover from the record, the first time plaintiff asserted title to such money was on June 31, 1937, when, by petition, it prayed for an order discharging it from any further liability and that such sums unrefunded "shall remain the property of the plaintiff, Illinois Bell Telephone Company." While this request might have been of a precautionary nature, yet it seems apparent that it was an idle gesture if the decree of June 11, 1934, was final and released plaintiff from all liability as to the unclaimed funds as is now contended.

■ The court, in its decree of June 11, 1934, reserved such jurisdiction "as shall be necessary to settle questions arising hereunder." Again, on December 31, 1934, the court reserved such jurisdiction "as shall be necessary or desirable to settle and dispose of questions arising under this and other decrees of this court." We think, however, no express reservation was necessary, as the court continued to have control of the parties and the subject matter. In fact, the court gave recognition to its continuing jurisdiction of the subject matter by its order of July 23, 1934, fixing fees to counsel for the subscribers at a certain percent of the total overcharge and in not confining the percent of the refunds made to the subscribers. Again, as late as February 5, 1938, in the order appealed from, the court awarded to the State of Illinois the sum of $60,000, and to the City of Chicago, the sum of $37,000 for additional expenses incurred by the state and the city respectively in the involved litigation. These sums, of course, must be paid from the funds remaining in the possession of the plaintiff.

The court, in connection with the decree under consideration, adopted certain findings of fact, included in which is the following:

"That the decree previously entered by this Court on June 11, 1934, was a final decree and finally disposed of all the questions then and now before the Court."

■■ It is urged that we are bound by this finding, and, of course, such is the rule if it is a finding of fact, and it has

substantial support in the record. To our mind, the construction to be placed upon the decree in question is one of law rather than of fact. We think it is the duty of this court to make a determination as to the finality of the decree and the effect which it had upon the parties before the court. But even if its construction was properly incorporated in a finding of fact, we do not believe it finds substantial support in the record. Our conclusion that the matter of the disposition of funds remaining in the possession of the plaintiff after June 1, 1937, was not considered and was not intended to be determined by the decree of June 11, 1934, finds additional support in a statement made by the court on January 24, 1938, during a hearing on the state's claim, as follows:

"I did not have any doubt but what everybody would come tumbling in to get these refunds, and I did not seriously consider or sufficiently consider this possibility of somebody not coming in and claiming the refund. We were in the midst of the depression, and five dollars was a fortune to the people who were entitled to it, and I thought everybody would be in and get it, and so we did not provide for the possibility of this, that it might exist and it might not be called for, but it was not ignored; it was only underestimated. If there was anybody who did not call for it, we thought that he would be somebody who had just a small claim or needed a guardian or something."

We, therefore, are of the opinion that the court not only had jurisdiction to entertain the claim as presented by the state, but that there was nothing in any of its former proceedings, including the decree of June 11, 1934, which precluded it from so doing.

■ It is also contended by the plaintiff in reliance on the decree of June 11, 1934, that it has made disbursements in excess of the overcharges which it collected from its subscribers, and, therefore, has an equitable claim to the funds now in its possession. It is not disputed but what plaintiff spent upwards of $2,700,000 in the making of refunds in conformity with the decree of June 11, 1934, and, in addition, some $166,000 has been paid to various parties to the litigation and their attorneys as fees and costs in connection with the same. While it seems to be conceded that plaintiff faithfully complied with the decree in the making of refunds, we do not see how it could hope to avoid the necessary expenses in making such refunds, nor in the payment of costs which follow the result of litigation. It must not be overlooked that it was responsible for the situation and that the burden incident thereto was necessary in order that it might extricate itself therefrom.

It is also claimed by the plaintiff that in its reliance upon the court decree releasing it from all liability, it compromised a claim in the amount of $550,000 which it had against the City of Chicago because of a franchise tax collected by the city upon the overcharge which plaintiff had collected from its subscribers. On the other hand, it is claimed by the state that by reason of the decree of June 1, 1934, the plaintiff was relieved of interest, on the amount of the overcharge, subsequent to the entry of the decree in the amount of $600,000 and was enabled to earn an additional $300,000 upon the amount of overcharges in plaintiff's possession. It is also urged by the plaintiff that, as the decree of June 11, 1934 authorized it to deduct from any overcharge due a subscriber, any amount which the subscriber might be indebted to it, and as substantially one-third of the amount now in its possession could properly be so offset, it is entitled to such credit. Undoubtedly there is merit in this latter contention, but inasmuch as the decree is to be affirmed on grounds hereinafter assigned, we do not deem it necessary to make such determination.

■ It is argued by the state that the provision in the decree fixing June 1, 1937, as the expiration of the period during which claims might be filed, was merely one of inquiry, rather than of limitation. With this argument we do not agree. That the time fixed during which claims by subscribers were required to be filed was reasonable, is conceded, or at any rate, not disputed. No objection was made to this provision of the decree at the time of its entry and none is made now. What the court said in A. J. Phillips Co. v. Grand Trunk Railway Co., 236 U.S. 662, on page 665, 35 S.Ct. 444, on page 445, 59 L.Ed. 774, we regard as pertinent.

"But while every person who had paid the rate could take advantage of the finding that the advance was unreasonable, he was obliged to assert his claim within the time fixed by law."

Again on the following page, 35 S.Ct. 446, the court said:

"Under such a statute the lapse of time not only bars the remedy, but destroys the liability * * *."

While the court there had under consideration a limitation period fixed by statute, we see no reason why a limitation fixed by the court would not produce the same result. Therefore, the decree, by its terms, on June 1, 1937, released the plaintiff from any liability insofar as its subscribers were concerned. It perhaps becomes important in this connection to determine the status occupied by plaintiff with reference to its subscribers. We are advised by the defendant that "it is not important to determine whether the telephone company is a trustee or simply a debtor." Whether this is important or not, we think the relation existing was merely that of debtor and creditor. The overcharges in the possession of the plaintiff were not earmarked or separated. Plaintiff was liable for interest on the overcharges and was permitted, by the court's decree, to offset against such overcharges, debts due from the subscribers. Thus, the court and the parties themselves must be held to have treated plaintiff as a mere debtor, as we think it was. If such be the case, the subscribers, at the expiration of the limitation period, were not only without remedy to assert a claim, but the debt owing by the plaintiff was extinguished.

The claim of the State of Illinois is predicated upon the doctrine of Bona Vacantia. It is admitted that no such doctrine exists, applicable to the situation here, by reason of any statutory provision of the State of Illinois, but it is argued that it was recognized by the common law of England prior to the year 1606, which was the fourth year of James the First. If such be the case, it, no doubt, is the law of Illinois by virtue of Chapter 28, Illinois Revised Statute, 1937, as follows:

"That the common law of England, so far as the same is applicable and of a general nature, and all statutes or acts of the British parliament made in aid of, and to supply the defects of the common law, prior to the fourth year of James the First * * * and which are of a general nature and not local to that kingdom, shall be the rule of decision, and shall be considered as of full force until repealed by legislative authority."

No case or text book published prior to that date relative to such doctrine is cited, but it is sought to establish the same by reference to cases decided in England subsequent to that time, which, it seems, may be done, provided of course, the principle is clearly established and applicable to the situation to which it is sought to be applied. People ex rel. v. Williams, 145 Ill. 573, 33 N.E. 849, 24 L.R.A. 492, 36 Am.St.Rep. 514, Phillippe v. Clevenger, 239 Ill. 117, 87 N.E. 858, 16 Ann.Cas. 207. The doctrine, so it is argued, is applicable to the instant situation on the theory that the unrefunded money remaining in the possession of plaintiff after June 1, 1937, was personal property without an owner and that by reason thereof, the same passed to the sovereign, the State of Illinois. Of the many English cases cited and discussed, there are none, the facts of which are similar to those of the instant case, but this does not constitute an insurmountable obstacle if the doctrine, as announced, can be made to apply. The earliest case cited is that of Middleton v. Spicer, 1783, 1 Brown, Ch. 201. There a testator, by his will, directed that his property be sold and the money paid to a charity, which, for reasons not important here to relate, was incapable of taking. There were no next of kin and the contest was between the executors and the Crown. The Chancellor decreed to the effect that the executors held as trustees without possibility of beneficial interest and decreed in favor of the Crown.

Undoubtedly, the leading case upon the doctrine sought to be invoked is that of Dyke v. Walford, 1846, 5 Moo.P.C.C. 434. In fact, in Re Barnett's Trusts, Vol. 3, British Ruling Cases, 198, (1902) it is on page 209 stated:

"All the learning on the subject of Bona Vacantia is to be found in the case of Dyke v. Walford. (5 Moo.P.C.C. 434)."

In the Dyke case, the question at issue was as to the right of the Duchy of Lancaster, on account of a charter from the Crown in 1837, to the personal property of an intestate bastard dying without next of kin. The court decided in her favor, basing its decision on Bona Vacantia. Among other things, the court said:

"The origin of it shows that, if it existed at all, it must have existed from the foundation of the monarchy; it is

the right of the crown to 'bona vacantia'; to property which has no other owner. (p. 495)."

It will be noted this decision was rendered in 1846, more than 200 years subsequent to the fourth year of James the First, and even at that late date, doubt was expressed as to the existence of such a prerogative in the Crown prior to the time of the decision of Middleton v. Spicer, supra. That there was much confusion and uncertainty as to the application of such doctrine, on the situation there existing, is well illustrated by the argument advanced by the various counsellors. The Solicitor-General argued as follows:

"Now, can it be said that, in this country, it is the law that bonum vacans should be brought into the treasury? Certainly not, a different rule prevails in England. In the case of Armory v. Delamirie, a chimney-sweep who found a jewel, was held to have a right to retain it against the Crown and everyone else. This shows that the law of England never presumed that the bonum vacans ever belonged to the Lord of the fee or the Crown."

This argument was answered by Parker, Q. C., in the following words:

"The rule in common law is that property must belong to somebody; and where there is no other owner, not where the owner is unknown, that is the distinction, it is the property of the Crown."

Parker's argument evidently prevailed, as the Court defined "the right of the Crown to 'Bona Vacantia' as a right 'to property which has no other owner.'"

Later (1933) In re Wells, 1 Ch.Div. 29, the court, in discussing the Dyke case, said:

"* * * where there is no other owner, not where the owner is unknown, that is the distinction, it is the property of the Crown."

Numerous cases are cited wherein it is claimed the doctrine has been recognized. We think it would serve no useful purpose, however, to discuss them. They perhaps, without exception, fall within one or more of the following categories:

"(1) death intestate with no next of kin of person capable of inheriting;

"(2) non-charitable trust with a failure of beneficiaries; or

"(3) corporation dissolved leaving property to which neither stockholders nor creditors were entitled under the English corporation law."

 Many reasons are advanced by plaintiff as to why the doctrine is not here applicable. We shall not discuss them all, as one good reason is sufficient. Under the state's theory, the only property which could pass to the state was that owned or possessed by the subscribers at the end of the limitation period. The argument of the state, in our opinion, is predicated upon a foundation which is unsound, in that, the subscribers, at the time when the state made claim, were neither in the possession of or the owner of any property, or right of claim thereto. Even before the period of limitation expired, they were not in the true sense, owners of the fund, or of any part thereof, in the possession of the plaintiff by reason of the overcharges which they had paid. They had only a claim against plaintiff for a refund. As heretofore determined, a relation of debtor and creditor existed. For those who failed to make claim in apt time, such relation was terminated. Arguments are presented pro and con that the doctrine of Bona Vacantia never was recognized as to debts. To our minds, this argument is beside the point, for the reason that when the state made claim, there was no longer a debt in existence. Therefore, there was nothing for the state to take.

 If, however, we should be in error in our conclusion that the only property interest which the subscriber had was a claim against plaintiff which was extinguished at the expiration of the limitation period, thereby leaving nothing to which the state could succeed, we would yet be compelled to decide against the state's contention on the ground that the common law on which it relies is of such an uncertain and indefinite nature in its scope and limitations that this court would not be justified in proclaiming its existence as a rule of law of Illinois applicable to a situation such as is here presented.

Therefore, the decree of the court below is affirmed.