Gabor G. KOVATS, Steven C. Procuniar, Joy L. Davis, Roberta M. Delson, Hace Tishler and Anna Beck, Plaintiffs,

v.

RUTGERS, The State University, Board of Governors of Rutgers, The State University, Edward Bloustein, as President of Rutgers, The State University and Individually and John R. Martin, as Vice-President for Personnel of Rutgers, The State University and Individually, Defendants.

Civ. A. No. 82–2000.

United States District Court, D. New Jersey.

April 24, 1986.

1470

Reinhardt & Schachter, P.C. by Denise Reinhardt, Newark, N.J., for plaintiffs.

Carpenter, Bennett & Morrissey by John J. Peirano, Newark, N.J., for defendants.

## OPINION

DEBEVOISE, District Judge.

This is an action brought by a group of professors formerly employed at Rutgers, the State University of New Jersey. Plaintiffs Gabor Kovats, Steven C. Procuniar, Joy L. Davis, Roberta M. Delson, Hace Tishler, and Anna Beck filed a Complaint on June 21, 1982 against defendants Rutgers, the Board of Governors of Rutgers, Dr. Edward Bloustein, as President of Rutgers and individually and John Martin, as Vice-President for University Personnel and individually. Plaintiffs allege they acquired academic tenure by virtue of University Regulation 60.1 and that their respective discharges without notice· and hearing violated their due process rights under the Fourteenth Amendment. Plaintiffs seek relief pursuant to 42 U.S.C. § 1983. Defendants now move for summary judgment and leave to amend the Answer. Plaintiffs cross-move for leave to amend the Complaint.

*Facts*

I entered an Order on October 7, 1982 administratively terminating this action pursuant to the abstention doctrine of *Railroad Commission v. Pullman Company,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). After final disposition of related state court litigation, I granted the motion of plaintiffs Procuniar, Davis, and Delson to reopen the action on September 26, 1983. The remaining plaintiffs, Kovats, Tishler, and Beck, voluntarily dismissed their claims in the state court proceedings in July 1983. I granted summary judgment in favor of defendants on grounds of *res judicata* in January 1984. The United States Court of Appeals for the Third Circuit reversed and remanded the case for determination of the property issue. *Kovats v. Rutgers,* 749 F.2d 1041 (3d Cir. 1984).

Defendants now move for summary judgment arguing the Eleventh Amendment poses a bar to maintenance of this action against Rutgers, the Board of Governors, and Bloustein and Martin in their official capacities. In the alternative, they contend Rutgers and the Board of Governors are not persons within the meaning of 42 U.S.C. § 1983 and cannot be sued under that statute. They also argue that the declaratory and injunctive relief plaintiffs seek cannot be obtained from Bloustein and Martin in either their official or individual capacities. Finally, they seek leave to amend the Answer to include the affirmative defense of qualified immunity. Defendants maintain that plaintiffs have alleged insufficient personal involvement on the part of Bloustein and Martin to satisfy 42 U.S.C. § 1983, and that monetary relief against them in their individual capacities should be dismissed on the ground of qualified immunity.

Plaintiffs contend that Rutgers and the Board of Governors are not instrumentalities of the state and, therefore, the Eleventh Amendment poses no bar to this action. Even if Rutgers is the alter ego of the state, they argue the University has waived its Eleventh Amendment Immunity. Plaintiffs also maintain that Rutgers, the Board of Governors, and agents acting in their official capacity are persons within the meaning of 42 U.S.C. § 1983. Plaintiffs seek leave to amend the Complaint to add specific allegations against Bloustein and Martin. They further assert defendants should not be allowed to add the prejudicial and futile defense of qualified immunity. Lastly, plaintiffs argue this court may exercise jurisdiction to grant declaratory and prospective injunctive relief against defendants even if they are entitled to immunity in accordance with *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

*Discussion*

■ The Third Circuit, after reviewing the *res judicata* question on appeal, concluded its opinion with the following instruction: "On remand the district court should address the property issue." *Kovats*, 749 F.2d at 1049. The present motions pertain to the Eleventh Amendment and qualified immunity but do not reach the property issue. By entertaining these motions, I am not unmindful of the Third Circuit's directive. However, on remand a case is before the district court "in the same posture it originally came...." *Union Pacific Railroad Company v. Johnson*, 249 F.2d 674, 676 (9th Cir.1957). Disposition of a question is implied if that question was necessarily implied in the claim before the appellate court or if failure to raise it constitutes an implied waiver. *Sprague v. Ticonic Bank*, 307 U.S. 161, 168, 59 S.Ct. 777, 780, 83 L.Ed. 1184 (1938). The issue of immunity falls within neither category. Thus, I am guided by the Supreme Court's finding in *Sprague* that "(w)hile a mandate is controlling as to matters within its compass, on the remand a lower court is free as to other issues." *Id.; see also Illinois Bell v. Slattery*, 102 F.2d 58 (7th Cir.1939). I construe the Third Circuit's instruction to mean the property question should be reached if necessary. Accordingly, these motions are properly before me.

### I. *Eleventh Amendment Immunity*

In *Miller v. Rutgers*, 619 F.Supp. 1386 (D.N.J.1985), I held that Rutgers is entitled to Eleventh Amendment immunity from suit in a federal court. I applied the factors set forth by the Third Circuit in *Urbano v. Board of Managers of New Jersey State Prison*, 415 F.2d 247 (3d Cir. 1969), *cert. denied*, 397 U.S. 948, 90 S.Ct. 967, 25 L.Ed.2d 129 (1970) to determine whether a state entity is considered the alter ego of a state and concluded that most of the *Urbano* factors demonstrate Rutgers' entitlement to Eleventh Amendment immunity. Plaintiffs assert several new arguments not considered in *Miller* and, in effect, urge reconsideration of that opinion. Because of the substantial concerns raised, it is appropriate to review the question of Rutgers' status.

Two considerations lead me to conclude that my decision in *Miller* was erroneous: (i) Review of additional financial data not submitted in *Miller* leads to the conclusion that Rutgers has non-state assets and recurring non-state income sufficient to ensure that any judgment against it need not be paid from the state treasury. (ii) Although the opinion in the recent Third Circuit case of *Mauriello v. The University of Medicine and Dentistry of New Jersey*, 781 F.2d 46 (3d Cir.1986) does not address the Eleventh Amendment question, the question was raised in the trial court and the Third Circuit had no difficulty in proceeding to the merits of the case, which sought damages and injunctive relief against the University under 42 U.S.C. § 1983. As will be discussed below, the University of Medicine and Dentistry is in a very similar posture to Rutgers.

■ I believe *Miller* correctly weighs the *Urbano* factors other than the source of payment of a judgment against Rutgers,

and the analysis of those factors need not be repeated here. Reevaluation of the critical source of payment factor, however, points to the ultimate conclusion that Rutgers is not entitled to Eleventh Amendment immunity.

Plaintiffs' counsel has thoroughly and elegantly set forth the history of Rutgers, beginning with its origins in 1766 as a private college. Today, Rutgers' holdings and income reflect that private origin and the steadily increasing role of the state in the functioning of the University. As is the case with many state-related universities, Rutgers has for years walked on both sides of the line demarcating its state and private ties. This is most evident when considering the source of funds for a judgment.

Rutgers contends, through the affidavit of its Senior Vice President for Program Development, Budgeting and Student Services, Marvin Greenberg, that any judgment against it would be paid in part from state appropriations. Greenberg Aff., ¶¶ 10–11. The University is self-insured on all claims under $250,000, so any judgment would allegedly come out of the commingled funds derived from the University's self generating income and state appropriations.[1]

In *Miller* plaintiff failed to demonstrate that any factual questions existed with re-

gard to this most important *Urbano* factor. *Miller*, 619 F.Supp. at 1390. Plaintiffs in this action argue that Rutgers has sources of funds other than state monies to satisfy a judgment against it and that commingling of funds does not warrant Eleventh Amendment immunity.

I outlined Rutgers' four sources of income in *Miller* relying on the affidavit of Charles Coyle, Rutgers' Assistant Vice-President for Budget and Resources. These sources are auxiliary income, restricted income, general University or self-generating income, and appropriations from the state. *Id.* at 1389. New evidence demonstrates that the significant auxiliary funds available to Rutgers may be and are pledged to various projects of Rutgers' choosing. For example, for fiscal years 1982–83 through 1984–85 Rutgers pledged 67.3% to 68.1% of its auxiliary income to holders of bonds issued under a trust indenture and a capital lease obligation with the New Jersey Educational Facilities Authority. The total amount of revenue attributable to auxiliary enterprises for those years ranged from approximately $44 million to $48 million. Lettieri Aff., ¶ 3, Ex. B. Thus, the University has control over non-state monies which it may use for a variety of purposes.

In addition, although the University pools its sources of income in one general

---

1. The sources of Rutgers' income for the last three fiscal years are set forth below. State appropriations and self-generating income such as tuition, endowment income, fees, contracts, grants and other income are commingled in the University's general operating account. Plaintiffs challenge these figures relying on Rutgers' Financial Report for 1983–84. Their numbers would necessitate only minor adjustments—potentially in Rutgers' favor. *See* 2/19/86 Reinhardt Aff.; Plaintiffs' Brief, Ex. 41. Since the amounts below are not dispositive of this motion, I shall not conduct further hearings to resolve minor discrepancies.

| Fiscal Year Ending June 30 | 1985 | 1984 | 1983 |
|---|---|---|---|
| Total Current Fund Revenues | 412,006,559 | 374,531,783 | 344,104,545 |
| Amount Received from State of New Jersey | 219,179,632 | 191,147,154 | 175,257,496 |
| Percent Received from State of New Jersey | 53.2% | 51.0% | 50.9% |
| Percent Received from Student Tuition & Fees | 19.6% | 20.7% | 20.7% |
| Percent Received from other sources including Federal appropriations, grants and contracts, gifts, endowment income and recovery of indirect costs. | 27.2% | 28.3% | 28.4% |

Lettieri Aff., Ex. A.

operating fund, in accordance with generally accepted accounting practices, it also maintains several segregated accounts in its own name. The general operating account at First Fidelity Bank in Newark has sufficient funds to pay immediate bills. Surplus cash is invested in interest bearing accounts at First Fidelity and Chemical Bank. The interest from these accounts totalled approximately $4 million in fiscal year 1984–85. Of that amount, $1 million was allocated to the general operating account. The remaining $3 million was invested in a separate Chemical Bank account and dedicated to the discretionary use of the Board of Governors. This "reserve fund" is to be used for University purposes and has funded scholarship programs, intercollegiate athletics, Rutgers University Press, and other projects. Tr. of Joseph Whiteside, Rutgers' Senior Vice-President responsible for financial management, at 29–30.

Rutgers also has a separate investment account for self-insurance. Approximately $5 million was funneled through the general operating account and deposited in this account in fiscal year 1984–85. The account earned 9–10% interest. These funds have been used for settling property, fire, workmen's compensation, and general liability claims against the University. *Id.* at 43–44. Rutgers also maintains a separate internal settlement account in the amount of several hundred thousand dollars. *Id.* at 60.

Rutgers receives gifts and donations through the Rutgers University Foundation. Its 1984–85 receipts totalled more than $17 million, part of which was available for unrestricted use. About $200,000 of the unrestricted funds was dedicated to a discretionary account maintained by the University's President. *Id.* at 53–54.

Lastly, the Board of Trustees holds title to various properties and endowment funds in its own name. As of June 30, 1985, the Board of Trustees held title to land valued at more than $40 million, buildings worth more than $31 million, and $48 million in endowment funds.[2] (The Board of Governors controlled land worth more than $9.5 million, buildings worth more than $323 million, and $32 million in endowment funds.) *Id.* at 25; Reinhardt Aff., Ex. 37.

Rutgers' private origins help explain why title to certain University property is still held by the Trustees. The 1956 Act created a new entity and arrangement with the state. In exchange for the state's promise to appropriate funds, the Trustees relinquished their power to run Rutgers. They could not transfer title pursuant to the terms of the charitable trust they held and administered, so their holdings were impressed with a public trust for educational purposes. N.J.S.A. 18A:65–26. Although they have the power to withdraw the use of properties and funds, this right is "more theoretical than realistic." *Rutgers, The State University v. Piluso*, 60 N.J. 142, 157, 286 A.2d 697 (1972) (construing N.J.S.A. 18A:65–27.II.).

Income from the Trustees' assets must be turned over to the Board of Governors, N.J.S.A. 18A:65–26(2), and is then deposited in the commingled general operating account. Included in this income is a large amount of unrestricted monies. For example, approximately $5 million of the Trustees' $48 million endowment fund is unrestricted. It generated $400,000 in discretionary income in fiscal year 1984–85 which ended up in the general operating account. Whiteside Tr. at 26–27.

█ If plaintiffs prevail, Rutgers will have to pay up to $250,000 of any award from its self-insurance account. The source of such a judgment therefore would be Rutgers' commingled general operating account which contains state appropriations. Payments from commingled funds can constitute interference with the state's fiscal autonomy. *Hall v. Medical College of Ohio at Toledo*, 742 F.2d 299, 305 (6th Cir.1984); *Jagnandan v. Giles*, 538 F.2d 1166, 1176 (5th Cir.1976). However, where

---

**2.** There has been no definitive ruling on whether creditors may attach the Trustees' property, but I need not reach this question in light of my other findings.

substantial restricted non-state funds are commingled with state appropriations or are otherwise available, as is the case here, commingling will not invoke Eleventh Amendment immunity. *See Blake v. Kline,* 612 F.2d 718, 724 (3d Cir.1979) (inquiry must be made whether entity has sufficient funds in a segregated, noncommingled account to meet plaintiff's claim and whether title to the funds is in the state or the entity).

■ Rutgers insists that payment of a judgment from either commingled or segregated funds would interfere with the state's fiscal processes given its relationship with the state. It can hardly be disputed that the state is intimately involved in Rutgers' budgetary process. *See* my discussion of the appropriations process in *Miller,* 619 F.Supp. at 1389–90. Fees, tuition, endowment income, etc., are factored into the preparation of the state's annual appropriation to Rutgers. Projections for these categories of self-generating income are relied on by the state legislature in its calculations. Thus a diminution in sources available for educational purposes may be reflected annually through larger appropriations. In other words, payment of retroactive damage awards may be made up by increased state funding. But the state is under no obligation to answer for Rutgers' debts. N.J.S.A. 18A:65–8. Nothing in Title 18A:65–1 *et seq.* creates a debt or pledge of credit of the state on Rutgers' behalf. If the state elects to respond to the payment of a judgment by increasing its appropriations to Rutgers, the indirect effect on the state's treasury will be sufficiently "ancillary" to be permissible under the Eleventh Amendment. *Edelman v. Jordan,* 415 U.S. 651, 668, 94 S.Ct. 1347, 1358, 39 L.Ed.2d 662 (1974); *Blake,* 621 F.2d at 726; *Gordenstein v. University of*

*Delaware,* 381 F.Supp. 718, 721 (D.Del. 1974).

Counsel for both parties have cited numerous cases concerning other state and state-related universities. I shall not discuss each since "(e)ach state university exists in a unique governmental context, and each must be considered on the basis of its own peculiar circumstances." *Soni v. Board of Trustees of University of Tennessee,* 513 F.2d 347, 352 (6th Cir.1975). I take particular note of two cases decided by district judges in the Third Circuit finding the University of Pittsburgh, Temple University, Penn State, *Samuel v. University of Pittsburgh,* 375 F.Supp. 1119 (W.D. Pa.1974), and the University of Delaware, *Gordenstein, supra,* not immune under the Eleventh Amendment.[3] In neither case did the state's Governor have the power to appoint a majority of the University's governing body. Also, state funding in each case in *Samuel* was somewhat less than that contributed by New Jersey to Rutgers. But the precise amount of appropriation is not dispositive. *Blake,* 612 F.2d at 723. More telling is the fact that each school has broad autonomy in fiscal matters. The schools have the power to issue bonds which create no state obligation, and they hold title to some of their facilities. Also, the University of Delaware maintains an endowment in its own name. *Samuel,* 375 F.Supp. at 1126, 1127; *Gordenstein,* 381 F.Supp. at 722.

I find more significant the Third Circuit's recent treatment of the University of Medicine and Dentistry of New Jersey (UMDNJ) in *Mauriello, supra.* The UMDNJ appears to be an even stronger candidate for Eleventh Amendment immunity than Rutgers. Like Rutgers, the UMDNJ can acquire and own property,[4] borrow money without creating an obligation on the part of the state,[5] enter into contracts,[6] and sue and be sued.[7] In addi-

---

**3.** The Third Circuit implicitly affirmed the Eleventh Amendment findings in *Samuel* on appeal by reviewing the merits of the district court's ruling. *Samuel v. University of Pittsburgh,* 538 F.2d 991 (3d Cir.1976).

**4.** N.J.S.A. 18A:64G–6(n)(1).

**5.** N.J.S.A. 18A:64G–6(o); N.J.S.A. 18A:64G–15.

**6.** N.J.S.A. 18A:64G–6(l).

**7.** N.J.S.A. 18A:64G–3.4.

tion, it is the public policy and responsibility of the state to provide operating funds to UMDNJ [8] as well as to grant it a high degree of self-governance.[9] The UMDNJ has greater state ties than Rutgers in two areas: its governance is vested in an eleven-member Board of Trustees *all* of whom are appointed by the Governor;[10] and, the state's Director of the Division of Investment, a division of the New Jersey Department of the Treasury, controls the investment of funds within the jurisdiction of the Board of Trustees.[11]

The UMDNJ argued it was entitled to Eleventh Amendment immunity before the trial court. Had it not, the jurisdictional defense could have been considered for the first time at the appellate level. *Edelman,* 415 U.S. at 677, 94 S.Ct. at 1362. The Third Circuit, however, proceeded directly to the merits. *Mauriello, supra.*

I conclude that, although the question is a close one, the new evidence and arguments submitted require departure from the conclusion in *Miller.* I find the *Urbano* factors, on balance, demonstrate Rutgers is not an alter ego of the state entitled to Eleventh Amendment immunity. I need not address Rutgers' alleged waiver of its immunity given this ruling.

■ The parties concede that the immunity claimed for the Board of Governors essentially flows from its status as a part of Rutgers. It therefore does not enjoy Eleventh Amendment immunity. The same holds true for defendants Bloustein and Martin in their official capacities. The University's voluntary decision to indemnify these officers for any judgment against them does not alter this conclusion.

## II. *Motions for leave to amend*

Defendants move for leave to amend the Answer to add the defense of qualified immunity for defendants Bloustein and Martin. (Presumably they will seek to assert this defense on behalf of defendant

Cole as well.) Plaintiffs move for leave to amend the Complaint to set forth specific acts and practices with which the individual defendants are charged and to add as a defendant Susan Cole, defendant Martin's successor. Both parties object to their opponent's motion citing prejudice. Defendants also contend plaintiffs have unduly delayed this request. I find both sides' contentions are without merit.

■ Fed.R.Civ.P. 15(a) commands that leave to amend "shall be freely given when justice so requires." It shall be granted freely in the absence of "undue delay," "dilatory motive," or "undue prejudice to the opposing party." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962). Since the issues raised by the amendments have been the subject of ongoing discovery, I fail to see how either party will be prejudiced by the amendments. Any alleged delay absent a showing of bad faith does not warrant denial of leave to amend. *Hoffman v. Charnita, Inc.,* 58 F.R.D. 86, 94 (M.D.Pa.1973); Wright, Miller & Kane, *Federal Practice and Procedure: Civil* § 1488. Both motions are accordingly granted.

## III. *§ 1983 claims*

■ Defendants raise two threshold challenges to the maintenance of a claim under 42 U.S.C. § 1983. First, they contend the claims against the University and the Board of Governors must be dismissed because they are not "persons" within the meaning of the statute. This argument cannot withstand scrutiny. In *Monell v. Department of Social Services of the City of New York,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that municipalities and other local governmental units are "persons" to whom § 1983 applies. There does not appear to be an analytical difference between universities and other governing bodies. *Gay*

---

**8.** N.J.S.A. 18A:64G–2.

**9.** N.J.S.A. 18A:64G–3.1.

**10.** N.J.S.A. 18A:64G–4.

**11.** N.J.S.A. 18A:64G–8.

*Student Services v. Texas A & M University,* 612 F.2d 160, 163–64 (5th Cir.1980).

Prior to *Monell* the Third Circuit entertained an action against the University of Pittsburgh, Temple University, and Penn State under 42 U.S.C. § 1983 affirming the trial court's finding they were persons within the meaning of § 1983. *Samuel, supra.* In *Mauriello, supra,* the Third Circuit likewise entertained a § 1983 action against the UMDNJ. I find these decisions persuasive. Additionally, Rutgers asserts the analysis for determining whether it is a "person" is related to the question of Eleventh Amendment immunity. *See Bailey v. Ohio State University,* 487 F.Supp. 601 (S.D.Ohio 1980). I have found the University distinct from the state for Eleventh Amendment purposes. It is sufficiently distinct for purposes of § 1983 as well.

■ Second, defendants challenge the sufficiency of the allegations against Bloustein and Martin. The Complaint, as amended, alleges they encouraged, affirmed, ratified, and directed the acts of subordinates in terminating plaintiffs. These charges allege sufficient personal involvement to satisfy 42 U.S.C. § 1983. They are sufficient to satisfy a motion to dismiss under the standard of *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1956). In order to prevail on a motion for summary judgment, the moving party must prove that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56. A motion for summary judgment may only be granted if there are no remaining issues of material fact which, if believed by the trier of fact, would justify a finding for the party opposing that judgment. *Bryson v. Brand Insulation, Inc.,* 621 F.2d 556, 559 (3d Cir.

1980). All evidence submitted must be viewed in a light most favorable to the party opposing the motion. *Wahl v. Rexnord,* 624 F.2d 1169, 1181 (3d Cir.1980).

■ Plaintiffs contend that defendants and their agents have consistently acknowledged through 1982 the possibility of de facto tenure via length of service. They offer an affidavit by Wells Keddie, President of Rutgers Council of AAUP, the faculty's representative for collective negotiation. Keddie avers that there is "a common understanding among faculty members and University Administrators that the University Regulation on page 60.1 confers tenure without limitation of term upon the passage of the requisite number of years in the appropriate rank." [12] As evidence of this "understanding," Keddie appended to the affidavit a typical settlement agreement of a faculty grievance. In the particular case, a Dr. Michael Hayes received an extension of time in his position, but the University exacted a promise from him that he "will (not) claim tenure on the basis of length of service." 9/21/83 Keddie Aff., Ex. A. Looking at this agreement in a light most favorable to plaintiffs as I must, it appears Rutgers' administrators— here, the Associate Provost for Personnel—acknowledged the possibility of obtaining tenure through length of service alone. This evidence, thus, presents a material issue of fact for trial.

Defendants, however, maintain that damage claims against the individual defendants must be dismissed on grounds of qualified immunity. As officers of a state university who exercise discretionary powers in performing their duties, defendants Bloustein and Martin are entitled to qualified immunity. *See Trotman v. Board of Trustees of Lincoln University,* 635 F.2d

**12.** Regulation 60.1 provides in part:

For those appointed before July 1, 1972: Assistant Professors ordinarily are appointed for terms of three years, provided, however, that any Assistant Professor who is reappointed as such after six years service in that rank thereafter holds office without limitation of term to hold office indefinitely at the pleasure of the Board of Governors.

For those appointed after June 30, 1972: All full-time faculty appointments or reappointments, after a seven-year period shall be considered to be without limitation of term and the appointee shall hold office indefinitely at the pleasure of the Board of Governors and shall be said to have academic tenure. 9/2/83 Keddie Aff., Ex. A.

216 (3d Cir.1980); *Skehan v. Board of Trustees of Bloomsburg State College,* 538 F.2d 53 (3d Cir.1976).

The standard governing claims of qualified immunity was set forth by the Supreme Court in *Harlow v. Fitzgerald,* 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) as follows:

... government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.

*Id.* at 818, 102 S.Ct. at 2738. Defendants insist plaintiffs' claim—that they were discharged without notice or a hearing in violation of their due process rights—are not based upon "clearly established" statutory or constitutional rights which a reasonable person would have known at the time of firing. Defendants note the significance of Regulation 60.1 remains in doubt today.

The Third Circuit recently reviewed the ambiguities of *Harlow*'s "clearly established" requirement. In *People of Three Mile Island v. Nuclear Regulatory Commissioners,* 747 F.2d 139 (3d Cir.1984), the Court of Appeals explained this standard

involves a determination of how close a factual correspondence is required between applicable precedents and the case at issue ... Some courts have required a relatively strict factual identity. Other courts have insisted that officials know and apply general legal principles in appropriate factual situations....

We adopt the second approach—requiring some but not precise factual correspondence and demanding that officials apply general, well developed legal principles.... While we cannot expect executive officials to anticipate the evolution of constitutional law, neither can we be faithful to the purposes of immunity by permitting such officials one liability-free violation of a constitutional or statutory requirement. Insisting on a precise factual correspondence between the conduct

at issue and reported case law is tantamount to such a license.

*Id.* at 144 (citations omitted).

■ There is a close factual nexus between plaintiffs' grievance and the 1972 Supreme Court decision in *Perry v. Sinderman,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972). The plaintiff in *Perry,* a teacher in the State of Texas' college system, alleged his procedural due process rights had been violated by Odessa Junior College's terminating him without a hearing or statement of reasons. Plaintiff had been employed in the state college system for ten years, the last four at Odessa Junior College under a series of one-year contracts. As in this action, plaintiff had no formal tenure contract and relied on a provision in the college's Faculty Guide as well as guidelines promulgated by the Coordinating Board of the state college system. He alleged the college had a de facto tenure program under which he had tenure. *Id.* at 599–601, 92 S.Ct. at 2698–2699. The Supreme Court held that university rules, policies, and understandings could give rise to a property interest in tenure protected by the due process clause. *Id.* at 601, 92 S.Ct. at 2699; *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972).

A person's interest in a benefit is a "property" interest for due process purposes if there are such rules or mutually explicit understandings that support his claim of entitlement to the benefit and that he may invoke at a hearing.

*Perry,* 408 U.S. at 601, 92 S.Ct. at 2699. As in *Goldberg v. Kelly,* 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), to which the *Roth* court cited, plaintiffs had not yet shown their entitlement to the "property" they claimed. But "they had a right to a hearing at which they might attempt to do so." *Id.* at 577, 92 S.Ct. at 2709.

The state of the law was therefore clearly established at the time of plaintiffs' termination. Defendants should have related *Perry* and *Roth* to the instant situation. *Hicks v. Feeney,* 770 F.2d 375, 380 (3d

Cir.1985). Consequently, I find defendants are not entitled to summary judgment on their qualified immunity defense.[13]

■ Finally, defendants move to dismiss the claims for injunctive and declaratory relief[14] against the individual defendants, Bloustein, Martin and Cole. The relief plaintiffs seek—reinstatement with promotion and tenure and a judgment declaring their entitlement to tenure—can only be conferred by the Board of Governors which plaintiffs are also pursuing. N.J.S.A. 18A:65–25(h). Defendants' motion is therefore granted.

*Conclusion*

Based on new evidence presented concerning the source of funds for a monetary judgment against Rutgers, I find the University is not entitled to Eleventh Amendment immunity. The Board of Governors likewise is not immune from suit. Both the University and the Board of Governors are "persons" amenable to suit under 42 U.S.C. § 1983.

The various motions for leave to amend are granted. Defendants' motion for summary judgment against Bloustein, Martin and Cole on grounds of qualified immunity is denied. Plaintiffs' claim for injunctive and declaratory relief against them is dismissed.

Counsel for plaintiffs is requested to submit an appropriate form of order consistent with this opinion. Both parties are requested to prepare for trial on the property question.

---

**13.** There are additional reasons why the defense of qualified immunity should not be available to defendants in this action. *Harlow's* objective standard was designed to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." *Id.,* 457 U.S. at 818, 102 S.Ct. at 2738. It was also intended to bar discovery until after resolution of the immunity question. *Id.* Neither rationale is applicable to this action. Defendants have raised the defense long after the commencement of discovery. And discovery has helped demonstrate that plaintiffs' claim is not insubstantial. Discovery has produced evidence which can be construed to show University administrators acknowledge the existence of de facto tenure, and that defendants have ratified a decision to terminate plaintiffs without notice and hearing.

**14.** Plaintiffs seek two forms of declaratory relief: a judgment declaring defendants have violated the due process clause in discharging plaintiffs without adequate procedural protections and a judgment declaring they are entitled to tenure. Presumably, defendants' motion only pertains to the latter, and I shall so treat it.