**Cynthia Jo SAMUEL and Dena Meyers,
Individually, and on behalf of all others
similarly situated, Plaintiffs,**

v.

**UNIVERSITY OF PITTSBURGH et al.,
Defendants.**

**Civ. A. No. 71–1202.**

United States District Court,
W. D. Pennsylvania.

April 10, 1974.

As Amended April 19, 1974 and
May 14, 1974.

Michael P. Malakoff, Daniel M. Berger, Berger & Kapetan, James H. Joseph, P. C., of counsel, Harry F. Swanger, Richard R. Isaacson, Pittsburgh, Pa., for plaintiffs.

Charles C. Arensberg, James M. Arensberg, Tucker, Arensberg & Ferguson, Israel Packel, Atty. Gen., Barry A. Roth, Deputy Atty. Gen., Thomas F. Halloran, Asst. Atty. Gen., Pittsburgh, Pa., Robert P. Meehan, Deputy Counsel, William H. Smith, Chief Counsel, Harrisburg, Pa., Dept. of the Auditor General, Richard Z. Freeman, Jr., Peter Platten, Ballard, Spahr, Andrews & Ingersoll, Philadelphia, Pa., Delbert J. McQuaide, John C. Gilliland II, McQuaide, Blasko, Brown & Geiser, State College, Pa., for defendants.

## OPINION

TEITELBAUM, District Judge.

This is a class action brought by the named plaintiffs against the University of Pittsburgh, Pennsylvania State University and Temple University (hereinafter referred to as Pitt, Penn State and Temple, respectively), certain named officers of those universities, and the Governor, Attorney General and Auditor General of the Commonwealth of Pennsylvania. By Opinion and Order of this Court dated August 21, 1972 (56 F.R.D. 435), the plaintiffs were determined to represent all married female students who since 1967 have attended any of the three defendant universities and who were classified as out-of-state students for tuition purposes on the basis of Rule B(2) of the Auditor General of Pennsylvania. The plaintiffs seek to have this Court declare Rule B(2) unconstitutional and to enjoin the defendants from administering any residency policy based upon Rule B(2) or its equivalent. In addition, the plaintiffs claim that they are entitled to restitution for those amounts paid in excess of the in-state tuition rate.

The case has proceeded as follows: The original complaint, brought against Pitt and the three state officials, alleged that jurisdiction existed under 42 U.S.C. § 1983 and its jurisdictional coordinates, 28 U.S.C. § 1343(3) and (4), and the

Fourteenth Amendment. Plaintiffs then amended their complaint to name as additional defendants, Penn State, Temple, Indiana University of Pennsylvania and the thirteen state colleges of Pennsylvania and the certain named officers of those institutions. A second amended complaint alleged a cause of action under Article I, Section 27 of the Pennsylvania Constitution, P.S.

Defendants moved to dismiss pursuant to Rule 12(b) of the Federal Civil Rules and at the same time opposed plaintiffs' motion that the action be maintained as a plaintiff/defendant class action. The Opinion and Order of August 21, 1972 denied defendants' motion to dismiss and held that the action was to be maintained as a class action as to plaintiffs only. Indiana University of Pennsylvania and the thirteen state colleges were dismissed as party defendants.[1]

Plaintiffs had previously moved to have a three-judge court hear the case. A three-judge court had been convened but was dissolved by Order of Court on February 16, 1972 when the Pennsylvania Attorney General withdrew his approval of Rule B(2) and the issue of state-wide applicability became moot. On August 25, 1972, after entry of the Order denying defendants' motion to dismiss, a hearing was held on plaintiffs' petition for a preliminary injunction. The petition was denied. Cross motions for summary judgment and plaintiffs' motion for partial summary judgment were then denied in March and April of 1973. Trial in this case commenced on July 16, 1973 and concluded on July 19, 1973.

This case revolves around the interpretation and effect of Auditor General's Rule B(2). Rule B(2), as promulgated by the office of the Auditor General on June 7, 1967, provided:

"The domicile of a wife (adult or minor) is that of her husband. Where, however, an unmarried woman en-

rolled as a student having a Pennsylvania resident status marries a non-Pennsylvania resident, she shall continue to be classified as a Pennsylvania resident within the meaning of these Rules."

Rule B(2) was in effect from June 7, 1967 until February 11, 1972, when the Attorney General of Pennsylvania withdrew his approval of the legality of the rule. For five months, until July 14, 1972, no official rule existed to guide the defendant universities in their classification of married women students. On that date, the Attorney General wrote each defendant university that a "married woman's residency should be determined in accordance with Rule B-3", which provided that a married woman's residency was *prima facie* the same as her husband's and that the presentation of convincing evidence could establish that a married woman was a Pennsylvania resident in spite of the fact that her husband was not. On April 6, 1973, Rule A(3) of the Pennsylvania Auditor General was promulgated to replace Rule B-3. Rule A(3) provides: "A married woman is presumed to have the domicile of her husband; however, such presumption may be rebutted by convincing evidence to the contrary." In addition, Rule A(3) sets out nine factors which will be considered to rebut the presumption that a married woman has the domicile of her husband. Rule A(3) is applied by the same administrative processes employed by the defendant universities in the administration of Rule B(2) and Rule B-3.

This case raises numerous issues as to (1) this Court's jurisdiction, (2) the immunity of the defendants, (3) the constitutionality of defendants' residency rules and practices, (4) the availability of restitution to the plaintiffs and (5) the proper method of judicial administration of class actions. Each major issue will be dealt with in turn, beginning with the issue of jurisdiction.

---

1. This Court's retention of Penn State and Temple as defendants and the elimination of the other universities as defendants was commented upon favorably by the Ninth Circuit Court of Appeals in La Mar v. H & B Novelty & Loan Co., 489 F.2d 461 (9th Cir. 1973).

## JURISDICTION

Plaintiffs assert that this Court has jurisdiction over their cause of action under any or all of three bases: (1) 28 U.S.C. § 1343 and 42 U.S.C. § 1983, (2) 28 U.S.C. § 1343 or 28 U.S.C. § 1331 and the Fourteenth Amendment and (3) pendent jurisdiction as to the state law claim made under Article 1, Section 27 of the Pennsylvania Constitution.

Section 1983 of Title 42, United States Code provides as follows:

> "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable . . . in an action at law, suit in equity, or other proper proceeding for redress."

In any determination of whether jurisdiction exists under Section 1983, there are two fundamental questions which can arise. The first question is whether the state action prerequisite of the statute is met. Because it is settled law that private individuals may not be held liable for deprivation of another's civil rights under Section 1983 (Adickes v. S. H. Kress & Co., 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142, 1970), fulfillment of the requirement that the defendants have acted "under color of state law" is the *sine qua non* of an action under the 1871 Civil Rights Act.[2]

But even where the existence of state action is clear, as in this case where the parties have stipulated that the defendants acted under color of state law, the problem of whether the defendants are "persons" within the meaning of the act often remains. The question of whether an entity is a "person" under Section 1983 is to some extent the same question as whether that entity is immune from liability under the principles of sovereign immunity or the Eleventh Amendment.[3] Therefore, where the involvement of the state in the activities of the defendant entity is so extensive

---

2. This Court, like the Supreme Court in United States v. Price, 383 U.S. 787, 794, n. 7, 86 S.Ct. 1152, 16 L.Ed.2d 267 (1966), and the Court of Appeals for the Third Circuit in Jackson v. Metropolitan Edison, 483 F.2d 754, 757, n. 4 (3d Cir. 1973), makes no distinction between the operative effect of the terms "state action" and "under color of state law".

3. In Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), the victims of a warrantless early morning police rampage through their apartment brought suit for damages under Section 1983 against the thirteen police officers involved and their municipal employer, the City of Chicago. The Supreme Court held that a cause of action was stated against the officers, but dismissed the action against the city, holding that a municipal corporation was not a person within the meaning of Section 1983. In the years since Monroe v. Pape was handed down, it has been severely criticized, (See, e. g., Kates & Kourba, Liability of Public Entities Under Section 1983, 45 So.Cal.L.Rev. 131 (1972)) but it has not been overruled. Its primary effect seems to have been to cause splits of authority and judicial confusion over what constitutes a person under the statute, see for example the cases cited on pp. 1124–1125, *infra*. The conflicts which have arisen as a result of the Monroe v. Pape decision are probably the result of an inherent lack of clarity in the decision. For instance, it is likely that the holding in Monroe v. Pape is bottomed upon implicit considerations of sovereign immunity, rather than any special insight into the thinking of the reconstruction era Congress, even though the majority in *Pape* seeks to extract guidance from century-old reports of Congressional debate. Questions of sovereign immunity themselves present important and difficult problems of interpretation and construction, many of which are discussed at some length at pp. 1128–1130, *infra*. But it is important to note that the question of which governmental bodies should be immune from say, tort liability is not the question of which institutions should be liable under the Constitution for the deprivation of individual civil rights. Different policy considerations underlie each question. This distinction assumes an even greater importance if it is assumed that the question of what constitutes a person under Section 1983 does not end with a determination of the intent of the framers of the Act.

that the defendant contends that it is, in effect, a "state instrumentality", the Court must determine whether or not the defendant is a "person" within the meaning of Section 1983. It is, of course, possible that the second question, whether the defendant is a "person", will never arise if the state's involvement with the defendant's activities is so concededly limited that only the state action question is raised. See, e. g., Pendrell v. Chatham College, 370 F. Supp. 494, (W.D.Pa.1974).

█ In essence then, the terms "state action" and "person" are labels which are used to characterize the two ends of the spectrum of state involvement in a defendant entity's activities. In order for a cause of action to be stated under Section 1983 there must be some minimum state involvement with the actions of the defendant, that is, the defendant must have been acting under color of state law in the activity complained of. But once that minimum of state involvement has been ascertained, federal jurisdiction under Section 1983 may still fail if the state can be fairly said to control the defendant's activities. If the state controls the defendant's activities, the defendant entity is a state instrumentality and is not a person under Section 1983.

Thus, the person and state action concepts are not mutually exclusive, but rather are complementary aspects of the same problem in that any analysis to determine if either exists must be concerned with the nature and extent of state involvement in the defendant entity's activities. Neither conclusion is to be arrived at *ipse dixit*, by declaration rather than demonstration; both determinations should be the product of painstaking judicial analysis and attention to detail.

In this case, the precise question before the Court is whether or not the three defendant universities are "persons" within the meaning of Section 1983. The problem does not arise as to the defendant state officials. In arguing this question, the universities place great reliance upon the following quotation from Braden v. Univ. of Pgh., 477 F.2d 1, 7, n. 10 (3d Cir. 1973):

> *"If the University is a state agency*, the cause of action based on 42 U.S.C. § 1983 cannot be maintained for in United States ex rel. Gittlemacker v. County of Philadelphia, 413 F.2d 84, 86 (3d Cir. 1967) . . . [it was held, in reliance upon Monroe v. Pape, that] . . . a municipality was not such a 'person' contemplated by the Civil Rights Act of 1871 (now 42 U.S.C. § 1983)." (Emphasis added.)

All three defendant universities contend vigorously that they are "state agencies" as that conclusory term is used in Braden. Their argument springing from the holding in Monroe v. Pape, *supra* is that since such state instrumentalities as the California Adult Authority (Olson v. California Adult Authority, 423 F.2d 1326 (9th Cir. 1970), cert. denied 398 U.S. 914, 90 S.Ct. 1717, 26 L.Ed. 2d 78) and the Pennsylvania Board of Parole (Taylor v. Board of Parole, 263 F.Supp. 450 (M.D.Pa.1967)) have been held not to constitute persons; by the same reasoning, if they are "state instrumentalities", they cannot be persons under the Civil Rights Act.

Those courts which have considered the question of whether or not a university or college whose operations interconnect with those of state government to some degree are state instrumentalities have arrived at varying conclusions. In Wolfe v. O'Neill, 336 F.Supp. 1255 (D.Alaska 1972); Holliman v. Martin, 330 F.Supp. 1 (D.Va.1971); Kirstein v. Rector of Univ. of Va., 309 F.Supp. 184 (D.Va.1970); and Sellers v. Regents of Univ. of Calif., 432 F.2d 493 (9th Cir. 1970), cert. denied 401 U.S. 981, 91 S.Ct. 1194, 28 L.Ed.2d 333 (1971), it has been held that certain state or state-related universities are not persons under Section 1983 and thus are not amenable to

suit under that statute. But in Green v. Dumke, 480 F.2d 624 (9th Cir. 1973); Anthony v. Cleveland, 355 F.Supp. 789 (D.Hawaii 1973); Lee v. Board of Regents, 441 F.2d 1257 (7th Cir. 1971); Brown v. Strickler, 422 F.2d 1000 (6th Cir. 1970); and Trister v. Univ. of Mississippi, 420 F.2d 499 (5th Cir. 1969), Section 1983 actions have been permitted against various state or state-related universities. Also, in at least two recent Supreme Court decisions, Papish v. Board of Curators of Univ. of Missouri, 410 U.S. 667, 93 S.Ct. 1197, 35 L.Ed.2d 618 (1973) and Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), suit has been permitted under Section 1983 against universities with significant state/school interconnections. The difficulty in interpreting this latter group of cases is that, although they are cited for the proposition that state and state-related universities are persons, there is no express language in the opinions to that effect.

Faced with the dearth of judicially acknowledged standards for making the determination as to whether a university with significant state/school interconnections is a state instrumentality and thus not a person, up until recently, many courts have been able to avoid making such a decision by holding that Monroe v. Pape did not preclude a suit for equitable relief, as opposed to damages, against a governmental entity, whether or not that entity was a person within the meaning of Section 1983. See, for example, Schnell v. City of Chicago, 407 F.2d 1084, 1086 (7th Cir. 1969).

This option is no longer available to a federal court. In City of Kenosha, Wisconsin v. Bruno, 412 U.S. 507, 513, 93 S.Ct. 2222, 2226, 37 L.Ed.2d 109 (1973) the Supreme Court stated:

> "We find nothing in the legislative history discussed in *Monroe,* or in the language actually used by Congress, to suggest that the generic word 'person' in § 1983 was intended to have a bifurcated application to municipal corporations depending on the nature of the relief sought against them. Since, as the Court held in *Monroe,* 'Congress did not undertake to bring municipal corporations within the ambit of' § 1983, 365 U.S. at 187, 81 S.Ct. at 484, they are outside of its ambit for purposes of equitable relief as well as for damages." [4]

The issue of whether a university with significant state/school interconnections is a state instrumentality and thus, not a person under Section 1983 must be faced squarely.

In Pendrell v. Chatham College, *supra,* this Court considered the question of whether or not the state action requisite of Section 1983 was satisfied as to a nominally private college. In *Pendrell,* it was held that the question "should be determined on the basis of the extent of governmental control, whether exercised or not, over the actions of the defendant." As pointed out above, the question of whether state action exists as to a college and the question of whether a college is a state instrumentality are both complementary aspects of the same problem. Both questions turn on the extent of governmental control over the defendant institutions' activities. The control test will be applied here as it was in *Pendrell.*

---

4. The difficulty of determining whether a university is a person is also avoidable by holding that those individual officers of the universities who are defendants are "persons", while the universities themselves are not. Since it cannot be said that the individual university officials who are defendants in this case have personally profited from the allegedly unconstitutional acts complained of here, to hold that only the officials, and not the universities themselves, were liable under Section 1983 would be to effectively deprive plaintiffs of the restitutionary remedy they seek. See pp. 1134–1136, *infra.* This Court disdains that solution.

There are four types of institutions of higher learning in the Commonwealth of Pennsylvania. First, there are private colleges, whose funding comes primarily from private sources and whose amenability to suit under Section 1983 is a matter of ascertaining the existence of state action. See Pendrell v. Chatham College, *supra*. Next, there are the two state-related universities, Pitt and Temple, whose status under Section 1983 is at issue in this case. At the opposite end of the spectrum from private schools like Chatham College are the thirteen state colleges in Pennsylvania. Judging by the indicia before the Court, the state colleges would clearly seem to constitute state instrumentalities as that term is meant in a Section 1983 context and thus immune from suit under the statute.[5] Penn State does not fall within any of these three categories. Its status under Section 1983 is *sui generis,* falling somewhere between that of the state colleges and the state-related schools.[6]

By statute (24 P.S. § 2510–201 et seq. as to Pitt and 24 P.S. § 2510–2 et seq. as to Temple), the Boards of Trustees of the two state-related defendant universities consist of 36 members each. Twelve board members, four each appointed by the governor, the speaker of the state house and the speaker pro tempore of the senate, respectively, are private citizens designated as Commonwealth Trustees. Three non-voting members of each board hold their positions *ex officio*: the governor and the superintendent of the department of public institutions sit on both boards, while the mayors ·of Pittsburgh and Philadelphia sit on the boards of Pitt and Temple, respectively. Clear majorities of both

boards, which bodies are vested by charter with responsibility for governing the college, are made up of privately employed citizens.

Penn State's Board of Trustees has 32 members, six of whom are appointed to three-year terms by the governor and four of whom , the governor himself and the state secretaries of education, agriculture and environmental resources, are *ex officio* members. A majority of Penn State's board is also made up of private citizens.

Comparison with the thirteen state colleges is useful. The state colleges do not possess corporate powers, do not own their own facilities and cannot incur debts independently of the Commonwealth. (24 P.S. § 20–2004 et seq.) Both Pitt and Temple, on the other hand, retained their independent corporate existence when they became state-related by virtue of 24 P.S. § 2510–203 (Pitt) and 24 P.S. § 2510–3 (Temple). Both Pitt and Temple hold title to and maintain their own facilities on campuses which also contain facilities owned by the state. 24 P.S. § 2510–202(5) (Pitt), 24 P.S. § 2510–2(6) (Temple). Both universities have the power to issue bonds which create no obligation on the part of the state. 24 P.S. § 2510–209 (Pitt), 24 P.S. § 2510–10 (Temple). Both universities, of course, possessed and exercised the independent power to make exceptions to Rule B(2) and its successors.

Probably the most important element in determining the extent of state control over the colleges' activities is financing. The following chart, incorporating the most recent figures for either

---

5. Since, of course, the status of the Pennsylvania state colleges under Section 1983 is not before the Court, except by analogy, the above statement is devoid of precedential value in any proceeding where the issue might be raised.

6. The differences between Penn State and the state-related schools are primarily his-

torical in their origin. Whereas both Pitt and Temple were founded as strictly private · institutions and operated as such until the mid-1960's, Penn State was created by act] of the state legislature in 1855 (24 P.S. § 2531) and in 1863 was designated as the state's "land grant" institution.

1972–1973 or 1973 submitted by the parties, sets out in detail the financial picture of each of the three defendant universities.[7]

|  | PITT | TEMPLE | PENN STATE |
|---|---|---|---|
| Total Revenue | $144 million | $114 million | $219 million |
| Amount from Comm. | $ 49 million | $ 54 million | $ 79 million |
| Percent from Comm. | 34.6% | 48.1% | 36.3% |
| Percent Amount from Tuition | 23.3% | 22.2% | 20.7% |
| Federal Govt. | 22.3% | 15.4% | 15 % |
| Private Funds | 10.8% | 2.7% | 3.7% |
| Self-Generated Income | 10.1% | 10.5% | 15.5% |
| State & Private (S) | $132 million | $ 58 million | $246 million |
| Land & Buildings (P) | $ 65 million | $ 63 million | $ 92 million |

Close and conscientious scrutiny of the above figures, and of the other indicia of state control or lack thereof set out above, make it clear that Pitt and Temple are actually and statutorily possessed of sufficient independence from the control of the Commonwealth to constitute persons within the meaning of Section 1983. Penn State, however, has yet to be considered.

Penn State is best described as a semi-autonomous state institution. Like Pitt and Temple, and unlike the state colleges, it has a private corporate existence distinct from that of the Commonwealth per se. Like Pitt and Temple, a certain percentage of its buildings and facilities are constructed by the General State Authority. Like Pitt and Temple, Penn State has the ability to incur debt on bonds it may issue without creating any obligation upon the Commonwealth.[8] Like Pitt and Temple, Penn State possessed and exercised the independent ability to administer and make exceptions to Rule B(2). Perhaps most importantly, Penn State receives a significantly smaller portion of its funding from the Commonwealth than Temple, which has previously been found not to be a state instrumentality.[9]

Under this state of facts, this Court finds that the Commonwealth does not exercise such actual or potential control over the operations of Penn State as to render that institution a state instrumentality as that term is meant in a Section 1983 context. This decision is expressly limited to the concept of an 'instrumentality' as it relates to Section

7. Because fiscal years were not complete at the time the figures were submitted, they are only estimates and consequently do not add up to precisely 100%.

8. A comparison of the relevant statutes (24 P.S. § 2510–209 and 24 P.S. § 2510–10 as to Pitt and Temple respectively and 24 P.S. § 2575.1 as to Penn State) would seem to indicate differences in the abilities of the institutions to issue such bonds, but the nature and extent of those differences, if any, is not in evidence.

9. It also cannot fail to be persuasive that when the Commonwealth Court of Pennsylvania was called upon to decide a very similar question—whether a state-related university (Temple) was a public or private institution, it held that Temple was a private institution.
"The entire management and administration of the University is . . . vested in a privately controlled body . . . The Temple University Commonwealth Act has not changed Temple's basic status as a privately governed university." Mooney v. Temple University Board of Trustees, 4 Pa.Cmwlth. 392, 394, 285 A.2d 909, 911 (1972).

1983; this Court does not mean to imply that The Pennsylvania State University is not an instrumentality of the Commonwealth for purposes of state law or other federal statutes. Pitt, Temple and Penn State are persons within the meaning of 42 U.S.C. § 1983.

■ Plaintiffs also contend and this Court finds that jurisdiction exists over the university defendants under the Fourteenth Amendment and 28 U.S.C. § 1343(3). As noted in Braden v. Univ. of Pgh., *supra,* the fact that a defendant is or is not a person within the meaning of Section 1983 does not "necessarily prevent the plaintiff's cause of action from being maintained under the Fourteenth Amendment. . . ." *Braden,* 477 F.2d at 7, n. 10, citing Brown v. Board of Education, 347 U.S. 483, 486–496, 74 S.Ct. 686, 98 L.Ed. 873 (1954) for that proposition. Thus, jurisdiction exists over the individual and corporate university defendants under both Section 1983 and the Fourteenth Amendment.

■ Jurisdiction having been found to exist as to the plaintiffs' federal claims, this Court will refuse plaintiffs' request that it exercise pendent jurisdiction over the state law claim. As the Supreme Court noted in United Mine Workers v. Gibbs, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966):

> "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."

Because Article I, Section 27 of the Pennsylvania Constitution has not yet been authoritatively interpreted by the Pennsylvania Supreme Court, this Court will abstain from unnecessary interpretation of its language.

## IMMUNITY

■ Each of the defendants, both the universities and the state officials, contend that they enjoy immunity from liability in this suit by reason of the Eleventh Amendment of the Constitution. The Eleventh Amendment provides as follows:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

Only if the defendant universities were deemed to be state instrumentalities could they be held to enjoy sovereign immunity. The status of each of the three defendant universities has been discussed and described in some detail in the preceding section hereof and none of them have been found to be state instrumentalities. Each of the defendant universities has been found to be an essentially private institution, insofar as the term "private" connotes an absence of state control over its operation. Since the three universities function autonomously from the state and have been found to be persons under Section 1983, the defense of sovereign immunity is unavailable to them.

■ The defendant state officials, however, present the question of immunity directly, arguing that they are immunized from suit by the Eleventh Amendment. But in so arguing the state officials overlook the impact of the landmark case of Ex Parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). Without analyzing the history and background of that famous decision,[10] it is sufficient to note that in *Ex Parte Young* the Supreme Court, notwithstanding the Eleventh Amendment, held that:

> "[I]ndividuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten . . . to enforce . . . an unconstitutional act . . . may be enjoined by a Federal court of equity

---

10. Such history and background can be found in Wright, Law of Federal Courts, § 48, pp. 183–186.

from such action." 209 U.S. at 156, 28 S.Ct. at 452.

Declaratory and injunctive relief against the enforcement, by state officials, of an allegedly unconstitutional statute is precisely what is sought in this case. The mandate of *Ex Parte Young* requires this. Court to accept federal jurisdiction over the defendant state officials.

The state officials contend that since the Commonwealth of Pennsylvania is obviously the "real party in interest" in this case, the Eleventh Amendment bars suit against them as individual agents of state policy. Such an argument asks this Court to reconsider the precise point decided by the Supreme Court in *Ex Parte Young*. As noted by the first Justice Harlan in his dissent in the case:

> "The suit . . . was, as to the defendant Young, one against him as, and only because he was, attorney general of Minnesota. No relief was sought against him individually, but only in his capacity as attorney general. . . . It would therefore seem clear that within the true meaning of the 11th Amendment the suit brought in the Federal court was one, in legal effect, against the state." 209 U.S. at 173–174, 28 S.Ct. at 459.

As noted by Charles Alan Wright, supra at 185–186, "There is no doubt that the reality is as Justice Harlan stated it and that everyone knew that the . . . decision in *Ex Parte Young* rests on purest fiction." But against the clear holding of one of the four or five most important Supreme Court decisions in this nation's history, "the authority and finality of . . . [which] can hardly be overestimated",[11] the collateral attacks of the state officials in this case that the state is the real party in interest or that they enjoy immunity by virtue of performing a quasi-judicial or quasi-legislative function are unavailing.

Defendant state officials also cite this Court to the decisions in Cobb v. City of Malden, 202 F.2d 701 (1st Cir. 1953), Basista v. Weir, 340 F.2d 74 (3d Cir. 1965) and Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) and contend that these cases establish the principle that a public official, acting in good faith[12] in the performance of his duties, is immune from civil liability in a civil rights action. While judges (Pierson v. Ray), members of city council (*Cobb*) and police officers (*Basista*), as well as other public officials, may utilize a good faith defense to actions for *damages* under the Civil Rights Act, no public official has an absolute and unqualified immunity from suit under Section 1983. Pierson v. Ray, *supra* at 555, 87 S.Ct. 1213. Pierson v. Ray and the other cases on the subject do not amount to "a directive that 'good faith' is a defense to *all* actions under the Civil Rights Act. Rather, *Pierson* . . . made 'good faith' a defense to a suit under § 1983 only where it is *also* a defense 'under the prevailing view [of tort law] in this country.'" Whirl v. Kern, 407 F.2d 781, 791 (5th Cir. 1969), cert. denied 396 U.S. 901, 90 S.Ct. 210, 24 L.Ed.2d 177.

Good faith is not a defense to an action for restitution under the common law. Restatement, Restitution, § 55. Thus, good faith is not a defense to an action for restitution under Section 1983. Baxter v. Birkins, 311 F.Supp. 222, 226 (D.Colo.1970) (three-judge court); Bennett v. Gravelle, 323 F.Supp. 203 (D.Md.1971) (three-judge court).[13]

---

11. Hutcheson, A Case For Three Judges, 47 Harv.L.Rev. 795, 799, n. 9 (1934).

12. Since this record contains no suggestion whatever of bad faith in the enforcement of residency rules by any party to this action, it is unnecessary to discuss whether the burden of proving good faith rests on plaintiffs or defendants.

13. In *Bennett*, the court stated that, as a matter of law and public policy, where racial discrimination is alleged, good faith could not be interjected as a valid defense to a suit under Section 1983. Presumably the same rationale could be applied where sexual discrimination is alleged, were sex to be held to be a suspect classification like race.

Even assuming *arguendo* that good faith is a defense to a civil rights action, the defense would not apply to defendant university officials since they cannot be state agents if, as has been found above, the schools by which they are employed are not state instrumentalities. There is no serious contention that the good faith defense applies to corporate bodies like the universities themselves. Thus, neither the defendant universities nor the defendant state officials enjoy immunity from suit for declaratory and injunctive relief in this case. As co-equal participants in the promulgation and administration of the residency rules under examination here, they share equal responsibility for whatever unconstitutional injustice has been visited upon plaintiff class members.[14]

## OPERATION AND EFFECT OF RESIDENCY RULES

During the course of the lengthy and complex litigation of this suit, an inordinate amount of attention has been paid to the penumbra of legal and factual questions which surround the operation and effect of the residency rules used by defendant universities. It is necessary, therefore, to focus upon the precise questions which this Court is deciding. In the first place, this Court has not limited itself to a consideration of Rule B(2) alone. Rule B(2), which was in effect from July 1967 until February 1972, was the most clearly delineated of the operational guidelines employed by the defendants. But insofar as other formal rules of the Auditor General or less formalized residency-determination procedures were used and had the same effect as Rule B(2), they have also been considered. Likewise, whether the residency rules of the defendants operated as rebuttable or irrebuttable presumptions is not the question before the Court. I have been concerned throughout this litigation with whether or not an undue burden, procedural, financial, or otherwise, has been placed upon married women students which was not placed upon single women, or upon single or married men. If such a burden was placed on one group of women, but not upon men or upon another group of women, then whether that burden is rebuttable or irrebuttable is immaterial; defendants' residency rules would be unconstitutional, notwithstanding fine distinctions attendant to their imposition.

The question of whether university residency rules *per se* are unconstitutional is also not before the Court. In Vlandis v. Kline, 412 U.S. 441, 452–453, 93 S.Ct. 2230, 37 L.Ed.2d 63 (1973) the Supreme Court held that a conclusive presumption that the domicile of a student remained the same throughout his attendance at the University of Connecticut was unconstitutional. The Supreme Court expressly mandated a procedural system whereby a student throughout his years of college attendance would be able to rebut any presumption of residence imposed upon him. The majority in *Vlandis* also observed:

"We fully recognize that a State has a legitimate interest in protecting and preserving the . . . right of its own bona fide residents to attend . . . [its colleges and universities] on a preferential tuition basis."

The other cases which have considered the question might be summarized as coming to the conclusion that the granting or denial of preferential in-state tuition rates is violative of neither equal protection guarantees nor the right to interstate travel. See, e. g., Starns v. Malkerson, 326 F.Supp. 234 (D.Minn. 1970), aff'd 401 U.S. 985, 91 S.Ct. 1231, 28 L.Ed.2d 527 (1971); Clarke v. Redeker, 259 F.Supp. 117 (S.D.Iowa 1966), cert. denied 396 U.S. 862, 90 S.Ct. 135, 24 L.Ed.2d 115.

Since this decision does not pass on this matter, it does not apply such a rationale.

14. Recognition of the equal responsibility of defendants is, of course, not dispositive of the question of their liability for restitution. This is discussed in the section entitled "Relief and Restitution", *infra.*

Since the determination of a student's domicile necessarily involves a factual determination of the student's intent to remain in a given place for an indefinite period, difficult problems are presented for the university. Since a person's future plans are often uncertain during the time he is attending college, and since at the same time, the student is often well-aware of the financial benefit he gains by giving information weighted to his advantage, the university is faced with serious administrative difficulties in making thousands of residency determinations in a given school year. Certainly, a state should not be discouraged from seeking excellence in its educational facilities or sustain injury from approaching it.

Rule B(2), in effect from June 1967 until February 1972, provided that the domicile of a wife *was* that of her husband. Rule B–3, in effect from July 1972 until April 1973, provided that a married woman's residence *was prima facie* that of her husband. Rule A(3), in effect from April 1973 until the present, states that a married woman *is presumed* to have the domicile of her husband and sets out the nine factors which will be considered in rebuttal of that presumption: (1) a lease or evidence of permanent reisdence, and/or (2) payment of state and local taxes, and/or (3) transfer of bank accounts, stock registration, etc. to Pennsylvania, and/or (4) an agreement for full-time, post-graduation employment in Pennsylvania, and/or (5) a Pennsylvania driver's license, and/or (6) membership in Pennsylvania social, athletic, civic, political or religious organizations, and/or (7) registration to vote in Pennsylvania, and/or (8) a statement of intention to reside indefinitely in Pennsylvania, and/or (9) considerations of demeanor. No single factor of the nine is conclusive in making the determination of residency and that is as it should be, for, as noted above, the task of making residency determinations is an especially difficult one which is properly left in the discretion of the appropriate university officials.

But, the singularly striking aspect of the application of residency rules at the defendant universities is the fact that no rule, rebuttable or irrebuttable, has ever existed to tie the residency classification of any group other than married women to the classification of someone else. Married men, single men and single women must indeed submit residency classification information to the registrars of their respective universities, but in their case no formal or informal rule has ever existed to tie their classification to that of another group, be it wives, parents, roommates or whomever. During the period in question, the policy of the three defendant universities, following the guidelines of the defendant state officials, has been to presume that a woman married to an out-of-state resident is herself an out-of-state resident, while a man married to an out-of-state resident was not presumed to be an out-of-state resident.

Defendants propose three justifications for imposing the presumptions outlined above upon married female students:

(1) Defendants' interest in preserving their fiscal integrity by providing a state-subsidized education only to residents of the Commonwealth.

(2) The validity in actual fact of the common law presumption that a woman has the domicile of her husband.

(3) The administrative convenience of operating under such a presumption.

The defendants' justifications stand essentially unchallenged. As to (1), Vlandis v. Kline, *supra*, has conclusively established that a non-private university has the qualified right to differentiate between resident and non-resident students for tuition purposes. As to (2), statistical summaries presented in evidence before this Court indicate that in 1972, 96.5% of all married women in the United States lived with their husbands. The third justification, that

**1132**

of administrative convenience, is of course not to be denigrated, but like the other two it is clearly superseded in importance by the constitutional right of all individuals to equal treatment before the law.

In Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), the states of Pennsylvania and Connecticut sought to justify their denial of welfare payments to persons with less than one year's state residency on grounds of administrative convenience, buttressed by appeals to the importance of protecting state fiscal integrity from welfare cheats and transient indigents. The justifications in *Shapiro*, though found to be valid, did not withstand constitutional scrutiny. The welfare residency restrictions were struck down as violative of equal protection.

The traditional scholarly analysis of the equal protection decisions of the Supreme Court dictates a three-tier approach to the problem. Where a legislative classification entails only economic or financial repercussions, as in a statutory differentiation between similar businesses for purposes of regulation, the lenient "rational relationship" test is imposed. E. g., Morey v. Doud, 354 U.S. 457, 77 S.Ct. 1344, 1 L.Ed.2d 1485 (1957). For the classification to pass constitutional muster, it need only be demonstrated there exists a rational relationship between the means used and the end sought to be fostered. But where "fundamental rights" are involved, or where "suspect criteria" are utilized in making the classification, more stringent standards are applied and accordingly it becomes more likely that the differentiation under examination will be found to be violative of equal protection guarantees.

Where a "fundamental right" is involved, the state must demonstrate a "compelling governmental interest" to justify making the differentiation, or the differentiation will fall. Shapiro v. Thompson, *supra,* wherein the right to interstate travel was deemed to be "fun-

damental", was the last case in which the Supreme Court expressly applied the compelling governmental interest test. Previously, the Court had held the right to procreation (Skinner v. Oklahoma, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655, 1942), the right to bail (Stack v. Boyle, 342 U.S. 1, 72 S.Ct. 1, 96 L.Ed. 3, 1951), and the right to vote (Williams v. Rhodes, 393 U.S. 23, 89 S.Ct. 5, 21 L. Ed.2d 24, 1968) to be "fundamental rights".

Where a "suspect criterion" is involved, the legislative differentiation is constitutionally permissible only if it can pass the test of "rigid judicial scrutiny". Needless to say, few if any classifications involving suspect criteria have been found to be constitutionally permissible. As of yet, only race (McLaughlin v. Florida, 379 U.S. 184, 85 S. Ct. 283, 13 L.Ed.2d 222, 1964) and national origin (Korematsu v. United States, 323 U.S. 214, 65 S.Ct. 193, 89 L. Ed. 194, 1944) may unequivocally be said to be suspect criteria.

Plaintiffs in this case urge the Court to hold that sex is a suspect criterion and cite Frontiero v. Richardson, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973) as support for the proposition that sex is, or should be, termed a suspect criterion by this Court. In *Frontiero,* the Supreme Court reversed a lower court decision which had upheld a federal statute mandating different treatment for female armed forces members than was accorded to males. Four justices based their decision on an express finding that sex is a suspect classification. But three other justices, while concurring in the result reached, refused to so hold. A fourth concurred on the basis of the due process clause of the Fifth Amendment. There was no majority opinion holding sex to be a suspect criterion.

Since the three-tier approach to equal protection questions outlined above is, or should be, merely an analytical device designed to simplify complex equal protection questions into their basic elements, it is not mandatory for a district

court to apply its terminology. I will not do so here and I will not hold sex to be a suspect criterion. It must be recognized that judicial adherence to the semantic framework of the three-tier approach inevitably entails far-reaching consequences. Once a "fundamental right" has been designated as such, or a "suspect criterion" judicially established, then, in the minds of the legal community, the burden of justification has irrevocably shifted to the defense in any circumstance, no matter how benign, wherein the "suspect" group or the "fundamental right" is affected in an allegedly discriminatory manner. The policy implications, to thoughtful practitioners and commentators, of the simple act of labeling sex as a suspect classification are profound.

Perhaps in an attempt to avoid the disproportionately significant impact of using the old semantic framework, at least one commentator has discerned a shift among Supreme Court justices away from the traditional three-tiered approach and toward a unitary equal protection standard. In Gunther, The Supreme Court—Foreword, 86 Harv.L. Rev. 1, 18–20 (1972), it is noted that:

"[T]he Court has apparently narrowed the linquistic gap between the two standards; it has avoided the terminology of the two-tiered[15] review in some cases by posing instead certain fundamental inquiries applicable to 'all' equal protection claims. Thus, in Weber v. Aetna Casualty & Surety Co., 406 U.S. 164 [92 S.Ct. 1400, 31 L.Ed.2d 768] (1972), . . . the Court stated, 406 U.S. at 173 [92 S.Ct. 1400], that the 'essential' inquiry in all equal protection cases is inevitably a dual one. What legitimate state interest does the classification promote? What fundamental personal rights might the classification endanger?"

It is this unitary approach to equal protection questions extracted from Supreme Court decisions which the Court will follow in this case.[16] This approach might well be termed a rigorous rational basis test, so as to distinguish it from the traditional rational basis test, whose application invariably ended with the classification being found non-violative of equal protection. See, e. g., Morey v. Doud, *supra*.

This Court's inquiry in this case has been whether there is a rational governmental interest furthered by the residency rules of the defendants. This Court finds that there is—the dual interest of administrative convenience and preservation of fiscal integrity. But the inquiry does not end with an answer to the first question. It has then been asked whether certain. fundamental personal rights, in the non-conclusory sense that that phrase is used in Weber v. Aetna Casualty and Surety Co., have been infringed. Operating upon a special sensitivity to sex as a classifying factor, this Court finds that the residency rules promulgated and administered by the defendants in this case have resulted in the denial of equal protection to plaintiff class members.

The result, and the reasoning employed to reach that result, in this case are entirely consistent with the approach of the Supreme Court in *Frontiero's* precursor, Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971). In *Reed,* perhaps the foremost example of the application of the more rigorous rational basis test which avoids the labeling of sex as a suspect criterion, the Supreme Court struck down a provision of the Idaho probate code which gave a mandatory preference to males over fe-

---

15. Professor Gunther transforms what this Court terms the traditional three-tiered approach to equal protection questions into a two-tiered approach by merging the fundamental right and suspect criterion questions into one category.

16. See Aiello v. Hansen, 359 F.Supp. 792 (N.D.Cal.1973) (three-judge court) in which this same approach, called therein a "slightly altered rational basis test", is applied.

males in the appointment of administrators. The Supreme Court reasoned that while the Fourteenth Amendment does not deny states the power to treat different classes of persons differently, it does deny

> "the power to legislate that different treatment be accorded to persons placed by a statute into different classes on the basis of criteria wholly unrelated to the objective of that statute. A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike'. Royster Guano Co. v. Virginia, 253 U.S. 412, 40 S.Ct. 560, 64 L.Ed. 989 (1920)." 404 U.S. at 75–76, 92 S.Ct. at 254.

The justification proposed for the mandatory appointment provision in *Reed* was, as here, administrative convenience, that is, the reduction of court workload by eliminating a type of probate contest. Of this rational and legitimate objective, the Court said:

> "The crucial question, however, is whether § 15–314 advances that objective in a manner consistent with the command of the Equal Protection Clause. We hold that it does not. To give a mandatory preference to members of either sex over members of the other merely to accomplish the elimination of hearings on the merits, is to make the very kind of arbitrary legislative choice forbidden by the Equal Protection Clause of the Fourteenth Amendment." 404 U.S. at 76, 92 S.Ct. at 254.

Therefore, in reliance upon Reed v. Reed, this Court finds that the residency rules administered and promulgated by the defendants were violative of the equal protection clause of the Fourteenth Amendment.

## RELIEF AND RESTITUTION

Having found that jurisdiction exists over the defendant parties and that the residency rules of the defendants are unconstitutional, this Court permanently enjoins the defendants from any further use of a presumption applicable only to married women in making its residency determinations. In the exercise of its broad equitable powers, this Court orders that in the future the defendants refrain from applying any such presumption of domicile to married women students.

The determination of residence for tuition purposes, a difficult process, as the Court well appreciates, may be based upon those nine factors outlined in Auditor General's Rule A(3). However, the residence of *all* students must be determined on the basis of those nine factors, without reference to whether the student is male or female, married or unmarried. The contention of the defendant universities throughout this litigation has been that they have operated all along under a procedure which took only these objective factors into account. If that is the case, then they will incur no hardship by virtue of refraining from applying Rule B(2) or its equivalent to women married to out-of-state residents. By applying Rule B(2), the universities imposed on that class of women a procedural burden which was imposed upon no other group of students. The unconstitutional application of a procedural burden upon a group of women singled out for reasons constitutionally unrelated to the legitimate objectives of the regulation is permanently enjoined.

Having enjoined all defendants from further application of unconstitutional residency rules, we now turn to the additional relief sought by plaintiffs. Plaintiffs seek, on behalf of all class members similarly situated, restitution of those sums paid by virtue of what have been found to be unconstitutional residency rules. That is, insofar as they were themselves entitled to pay an in-state tuition rate, they desire to be reimbursed for the difference between the lesser in-state rate and the higher out-of-state tuition they were forced to

pay. There are, of course, two major elements which must be proven to enforce their claim: first, that they were entitled to pay an in-state tuition rate and second, that they in fact paid a higher out-of-state rate by virtue of the fact that they were married to an out-of-state resident and the presumptions of Rules B(2), B–3 or A(3) were applied to them. These factual questions apply to each and every class member who seeks restitution. The manner in which these individual claims will be heard will be discussed later in this Opinion. First however, it is necessary to establish the basis of plaintiff class members' entitlement to restitution in the first place.

■■■ The equitable remedy of restitution is part and parcel of the injunctive relief already granted plaintiffs. Having assumed jurisdiction in equity over plaintiffs' claim for injunctive relief, the Court may pass upon the intertwined question of restitution as it sees fit. Porter v. Warner Holding Co., 328 U.S. 395, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946). See also Moore's Federal Practice, ¶ 38.11[6], ¶ 38.24[1] & [2].

■■■ The law of restitution is based upon equitable principles of unjust enrichment. Restatement, Restitution, § 1. Although restitutionary relief entails a return to the *status quo ante,* one may not be restored to his previous position unless some actual benefit has been conferred upon the defendant. Berman v. Henrick, 346 F.2d 116 (3d Cir. 1965), cert. denied 382 U.S. 892, 86 S.Ct. 185,

15 L.Ed.2d 150. In other words, restitutionary relief will not lie unless the defendant has wrongfully secured a benefit which it would be unconscionable for him to retain. Brereton's Estate, 388 Pa. 206, 130 A.2d 453 (1957).

■■■ This prerequisite to restitutionary relief, the securing of a benefit by the defendant, cannot and has not been demonstrated as to the defendant state officials. The out-of-state tuitions which were paid by plaintiff class members were paid to the defendant universities and were never transmitted, directly or indirectly, to any Commonwealth officials. Since the offices of the state officials were in no way affected by payment of the out-of-state tuitions, and since it is not even suggested, in line with the fiction of *Ex Parte Young,*[17] that the state officials received any personal benefit from the payments, it is held that plaintiff class members are not entitled to restitution from defendant state officials.

The situation is very different, however, as to defendant universities.[18] Pitt, Penn State and Temple received a direct financial benefit which was not due them, (assuming, of course, that any or all class members were entitled to an in-state residency classification and paid the higher out-of-state rate as a result of Rule B(2) and its successors. )In accord with the equitable principles discussed above, it is held that plaintiff class members are entitled to restitution from defendant universities.[19]

17. What I consider to be an erroneous extension of the principles of *Ex Parte Young,* namely, if state officials may be enjoined in federal court despite the prohibitions of the Eleventh Amendment, then they may also be held liable for restitution, has apparently been the implicit basis for those decisions in which state officials have been held liable for restitution. See, for instance, Sterrett v. Mothers' & Childrens' Rights Org., 409 U.S. 809, 93 S.Ct. 68, 34 L.Ed.2d 70 (1972) and Wyman v. Bowens, 397 U.S. 49, 90 S.Ct. 813, 25 L.Ed.2d 38 (1970). For the reasons set forth in the text, I do not choose to follow these cases. The recent Supreme Court decision of Edelman v. Jordan, 415 U.S. 651,

94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) is to the same effect.

18. When the term "defendant universities" is used, it is meant to include defendant officials of those universities. They have not personally benefitted from any tuition payments, of course, and are not personally liable themselves for restitution but to the extent that restitution becomes necessary, it is desirable that they be accountable for repayments.

19. The above holdings as to the respective defendant parties are made without prejudice to the rights of the defendant universities to seek, through whatever means they

Finally, it should be noted that defendant universities' argument that the restitutionary repayment of excess tuition to plaintiff class members will work a financial hardship on them has been earnestly considered. Apparently, each of the three universities here involved have operated at or near a deficit in recent years, and the general financial outlook of each of them is less than rosy. While the same might be said of many educational institutions in this country, the Court has nonetheless taken this situation into account in arriving at its decision. It is believed, in light of the termination of the plaintiff class discussed in the next section, that the financial burden incurred by defendant universities will be strictly limited to what is fair and just under the circumstances.

### PLAINTIFF CLASS

The defendant universities having been found to have administered unconstitutional residency rules, it is clear that, to the extent that plaintiff class members come forward and demonstrate (1) that they were entitled to pay an in-state tuition rate during their attendance at Pitt, Penn State or Temple and (2) that they were deprived of that right by reason of the operation of Rule B(2) or its equivalent, then defendant universities are justly liable in equity to restore to those persons the excess tuition unconstitutionally paid. Unfortunately, the identity, number and location of married women who fit into these precise categories is unknown to the Court. Therefore, taking cognizance of the dissimilar factual makeup of each class member's claim, the Court will decertify the plaintiff class at this time and allow each plaintiff class member to press her claim individually. Apart from noting that each individual class member may be able to present this

Opinion as res judicata or collateral estoppel on the issue of liability and then proceed to establish her right to receive restitution in accord with the guidelines outlined above, I make no comment on the questions of jurisdiction, venue and procedure which may arise in the handling of these individual damage claims.

The procedure followed here of decertifying the class after a determination of liability was specifically provided for in the Advisory Committee Note on then proposed Rule 23:

> "This provision recognized that an action may be maintained as a class action as to particular issue only. For example, in a fraud or similar case the action may retain its 'class' character only through the adjudication of liability to the class; the members of the class may thereafter be required to come in individually and prove the amounts of their respective claims." 39 F.R.D. 69, 106 (1966).

The Committee's thinking is in reference to the specific language of Rule 23(c)(4)(A) which provides: "When appropriate . . . an action may be brought or maintained as a class action with respect to particular issues."

In this case, as was held in the previous Opinion, 56 F.R.D. 435 (1972), the four prerequisites to the maintenance of a class action contained in Rule 23(a) were met as to the issue of liability. But now it is clear that the prerequisite of Rule 23(a)(2), the existence of questions of law or fact common to the class, is not met as to the issue of damages or restitution. Each and every class member will present an entirely different factual basis for her contention that she is due restitution.

The conclusion that there will be in this case no questions of fact common to the class as to restitution may seem to some to be a truism, a situation which is

---

deem appropriate, contribution from the Commonwealth. The Court has no power, of course, to enforce the universities' claims, but such a result would seem only equitable in light of the fact that it was solely by rea-

son of the Auditor General's rules, approved by the Attorney General, that the universities engaged in the unconstitutional conduct complained of here.

inherent in almost every class action brought under Rule 23. Indeed, this may be the case. It is this very paradox, with its potentially weighty policy implications, which is currently the concern of the Supreme Court.

Where there are no questions of fact common to the class as to damages, the District Court has two alternatives: (1) decertify the class and allow individual claims to be processed separately, or (2) allow "fluid recovery", wherein damages are determined as to the class as a whole. The whole concept of "fluid recovery" was recently disapproved as "illegal, inadmissible as a solution of the manageability problems of class actions and wholly improper". Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1018 (2d Cir. 1973) (*Eisen III*). Although the Supreme Court granted certiorari and heard arguments in the case recently, as of this writing, *Eisen III* stands as the most cogent expression of the practical and policy problems involved in trying a Rule 23 class action.

The opposing interests in conflict in Rule 23 adjudications are clear. On the one hand, class actions represent one of the few effective vehicles available to provide a forum for the resolution of "public interest" legal issues. Many commentators, advocates and judges have urged that Rule 23 be given an expansive reading, viewing the Rule as a vehicle for "consumerism", powered by the enlightened self-interest of plaintiff's counsel. On the other hand, the problem of how much reward is properly due an attorney for the successful pursuit of that enlightened self-interest, along with the larger, practical problems of notice and manageability of class suits, have become the focus of a burgeoning movement to reform Rule 23. At this point in time, *Eisen III*, which seems to impliedly mandate decertification of an unmanageable class after a determination of liability, provides what appears to this Court to be an effective solution to the problems inherent in Rule 23 class actions.[20]

A third alternative means of handling the problems attendant to Rule 23 class actions is suggested in Katz v. Carte Blanche, 496 F.2d 747 (3d Cir. 1974). In *Katz*, a majority of the Third Circuit Court of Appeals sitting *en banc* reversed this Court's holding that a class action was superior to other methods of handling that case and authorized utilization of what it called the "test case" technique for deciding liability where a class action is sought. Concerned with the potentially deleterious effects of notice upon the defendant in the case, the *Katz* majority ruled that class determination and notice to the class should be postponed until there has been a determination as to defendant's liability.

This Court is of the opinion that adherence to the *Katz* "test case" solution at this time in this case would serve no useful purpose. Noting that the "test case" solution was neither proposed nor discussed in this case by either side, and noting that I have proceeded throughout this litigation without having the benefit of the *Katz* guidelines before me, I am acting, within the broad discretion accorded a District Court under Rule 23, to achieve the sought-after objectives of *Katz* by other means. To my mind, decertifying an unmanageable class in this case after a determination of liability achieves precisely those objectives which were uppermost in the minds of the *Katz* majority. Moreover, because the class had already been determined in this case well before any determination on liability, use of the *Katz* procedure is obviously not now a practicable consideration.

The *Katz* ruling will undoubtedly add to the ferment which is currently taking place over the policies to be furthered by Rule 23—that is, *Katz* speaks to the question of whether the Rule is to be given, in the words of Judge Medina in *Eisen II*, 391 F.2d 555, 563 (2d Cir.

---

20. See the excellent Note, Eisen v. Carlisle & Jacquelin III: Applying The Axe To The Green Bay Tree, 35 U.Pitt.L.Rev. 450

(1973), for a more complete discussion of the third *Eisen* decision.

1968), "a liberal rather than a restrictive interpretation". Notwithstanding its utility in that regard, *Katz* cannot be followed here for the ample reasons set out above.

The foregoing shall constitute, in accordance with Rule 52(a) of the F.R. Civ.P., this Court's findings of fact and conclusions of law in this case. An appropriate Order in accordance with this Opinion shall be entered.